Hillsborough
No. 84-416

## Skandinavia, Inc.

### v.

## Odilon A. Cormier

July 9, 1986

*Robert H. Rowe*, of Amherst, by brief and orally, for the plaintiff.

*Devine, Millimet, Stahl & Branch P.A.*, of Manchester (*Finis E. Williams* on the brief and orally), for the defendant.

BATCHELDER, J.   This appeal arises from the alleged breach of a purchase and sale agreement governing the plaintiff's sale of its business of manufacturing, importing, and selling polypropylene underwear to the defendant Cormier. The plaintiff brought an action in assumpsit in superior court alleging that Cormier and Polypro, Inc. had failed to pay sales commissions owed to the plaintiff under the agreement and to pay for inventory transferred by the plaintiff to Cormier. On appeal, the defendant challenges the decision of the Master (*James D. O'Neill*, Esq.), which was approved by the Court (*Wyman*, J.), awarding the plaintiff $103,735.44 in damages. We affirm.

The pertinent facts follow. In 1981, after two years of poor sales, the plaintiff was short on capital to service debts and manufacture goods. As a result, Frederick D. Noyes, the plaintiff's president, entered into a series of negotiations with Cormier, an experienced textile manufacturer, concerning the plaintiff's polypropylene underwear business. Thereafter, the plaintiff as seller and Cormier as purchaser executed a purchase and sale agreement on June 15, 1981. The contract provided for the sale of (1) the trade names "SXC Polypro," "Polypro," and "Polypro, Inc."; (2) certain inventory of Polypro underwear; and (3) certain contracts for the sale of Polypro underwear (including a contract with L. L. Bean).

Under the agreement, the plaintiff agreed to act as a marketing agent for Polypro underwear for a one-year period. Cormier agreed to sell the existing inventory transferred to him by the plaintiff ("old" inventory), to manufacture and sell new goods ("new" inventory), and to pay commissions to the plaintiff. Cormier contracted to pay the plaintiff sums equal to twenty-six percent of sales originated by the plaintiff, and twenty percent of sales not originated by the plaintiff, for a one-year period. The payment terms provided for a $20,000 payment on the closing date, "to be credited as an advance against commissions." Commissions earned in excess of $20,000 were to be paid monthly.

In addition, the parties agreed that all Polypro sales were to be based on a so-called "'keystone' [m]arkup" of 100% to Polypro, Inc., and that Cormier "shall have a new corporation, 'Polypro, Inc.' formed and shall assign all of his right and obligation" under the agreement to the corporation.

An amendment to the agreement was entered into on the same date and governed the commissions due to the plaintiff on the sale of existing inventory and the L. L. Bean goods. Because the markup on these goods was less than 100%, the parties agreed to a fifty-two/forty-eight percent split on "the margin above the cost of the goods" between seller and purchaser, respectively.

Pursuant to the agreement, inventory was transferred to Cormier in late June 1981. On July 22, 1981, Polypro, Inc. was formed and capitalized in the amount of $2,500. Correspondence between the parties indicates that thereafter the plaintiff conducted business with both Cormier and Polypro, Inc.

The plaintiff's superior court action alleged that Cormier breached the purchase and sale agreement in March 1982 by failing to make payments due under the agreement. Polypro, Inc. was added as a defendant pursuant to a pre-trial motion, but after trial the master recommended that the claim against Polypro, Inc. be dismissed. The master found that the corporation did not become the assignee or delegatee of Cormier under the agreement, or enter into any agreement with the plaintiff. Based on the evidence, the master found Cormier, but not Polypro, Inc., liable under the agreement, and awarded damages against Cormier. He appealed.

The issues raised on appeal are whether (1) Polypro, Inc. and not Cormier is liable under the agreement; (2) the master correctly ruled that no assignment or novation occurred; (3) the plaintiff represented to Cormier, and the contract provided, that a 100% profit margin was a condition precedent to the payment of twenty-six percent sales commissions to the plaintiff; (4) the master correctly awarded damages to the plaintiff for inventory sold to Cormier; and (5) the master erred by including bad debts in determining the value of sales of new inventory.

We first address whether the master correctly found Cormier and not Polypro, Inc. liable under the agreement. Cormier raises several arguments in an effort to avoid personal liability. First, he argues that Polypro, Inc., rather than himself, is liable under the agreement because he acted only as a promotor for the corporation. In support of this contention, he refers to paragraph three of the agreement: "It is understood by the parties that in order to complete this transaction, Cormier shall have a new corporation, 'Polypro, Inc.' formed and shall assign all of his right and obligation under this agreement to said Corporation."

██ We agree with the master that Cormier's attempt to avoid contractual liability by claiming the status of a promoter is unavailing. The contractual language quoted above does not discharge Cormier.

"As a general rule promoters are personally liable on contracts which they have entered into personally, even though they have contracted for the benefit of a projected corporation; the promoter is not discharged from liability

by the subsequent adoption of the contract by the corporation when formed, unless there is a novation."

*Moody v. Bogue*, 310 N.W.2d 655, 661 (Iowa Ct. App. 1981).

■ Cormier further contends that Polypro, Inc. was incorporated and acted in reliance on the agreement, thereby vesting rights in the corporation and making the corporation liable under the agreement. *See* H. HENN & J. ALEXANDER, LAWS OF CORPORATIONS § 111 (3d ed. 1983). This argument is unpersuasive because the corporation took no action to adopt or ratify the agreement. *Id.*; *see RKO-Stanley Warner Theatres, Inc. v. Graziano*, 355 A.2d 830, 834 (Pa. 1976). Although the defendant contends that the corporation assumed the rights and obligations of the agreement, we find that Polypro, Inc. did not adhere to the statutory formalities required for the conduct of business affairs. *See* RSA 293-A:35, :50 (Supp. 1985). No contracts were authorized by the corporation's board of directors, and no authority was granted by the corporation to any of its officers to purchase the inventory from Cormier. Accordingly, we agree with the master's finding that Polypro, Inc. did not become liable under the agreement.

■■ We also reject Cormier's argument that he was released from liability by assignment. The record discloses no assignment of interest or obligation by Cormier. An express statement in a contract that a party *shall* assign its liability in the future only sets the stage for an assignment; it does not operate as one. In order to assign thousands of dollars' worth of goods, formal contractual requirements imposed by statute must be met. *See* RSA 382-A:2-201. In attempting to assign his rights and obligations to Polypro, Inc., Cormier did not comply with these statutory requirements or with the terms of the agreement, which requires any amendment to be in writing.

■ Likewise, we are not persuaded that a novation occurred. "A novation is a substituted contract that includes as a party one who was neither the obligor nor the obligee of the original duty." RESTATEMENT (SECOND) OF CONTRACTS § 280 (1981). A novation requires "(1) a previous, valid obligation; (2) the agreement of all parties to a new contract; (3) the extinguishment of the old contract; and (4) validity of the new one." *Moody v. Bogue*, 310 N.W.2d at 661.

"A promoter may be discharged from liability . . . on a pre-incorporation contract by a novation if the corporation assumes the contract and the other contracting party assents to the substitution of the corporation for the pro-

moter. . . . [But t]he doctrine of novation is highly techni-
cal, and a true novation seldom occurs in promotion
cases."

18 AM. JUR. 2d *Corporations* § 140 (1985) (footnotes omitted).

■ Cormier could not unilaterally discharge himself from the
contract he signed with the plaintiff; some affirmative action by the
plaintiff was needed to release Cormier individually. The evidence
indicates that the plaintiff relied on Cormier's personal wealth in
entering into this unsecured agreement. We find no express intent
on the plaintiff's part to release Cormier from liability. Accord-
ingly, no express novation occurred. This court has stated, however,
that "[a]ssent to the terms of a novation need not be shown by
express words, but may be implied from the facts and circum-
stances attending the transaction and the conduct of the parties."
*Tentindo v. Locke Lake Colony Ass'n*, 120 N.H. 593, 598, 419 A.2d
1097, 1101 (1980). The master ruled that this was not one of the
exceptional instances in which a novation occurred after a corporate
promotion contract because there was no evidence of assent to such a
substitution on the plaintiff's part. He found that the evidence
"demonstrated that no assignment, release, accord and satisfaction,
equitable assignment, or express or implied novation occurred."

■■ This court will uphold a master's findings unless they
are unsupported by the evidence or erroneous as a matter of law. *In
re Adoption of Baby C.*, 125 N.H. 216, 225, 480 A.2d 101, 106 (1984).
"[T]he master is in the best position to observe the parties, evaluate
the evidence, and assign credibility to the testimony." *Id.* In this
case, we agree with the master's assessment of the evidence regard-
ing the alleged assignment and novation.

The defendant next argues that the master erred in awarding the
plaintiff twenty-six percent commissions on the sale of new Polypro,
Inc. inventory because the contract stated, and the plaintiff repre-
sented, that a twenty-six percent commission on sales would be paid
only if Polypro, Inc. achieved a keystone markup of 100%. He argues
that paragraph one of the agreement, which states that "[a]ll Poly-
pro sales shall be based on a 'keystone' Markup (100%) to Polypro,
Inc.," constituted a promise that he would be able to realize a 100%
profit margin. He also argues that the provision amounts to a condi-
tion precedent to the obligation to pay twenty-six percent commis-
sions on sales of new inventory. Cormier concludes that since the
condition was not met, the contract is silent on the commission due,
and parol evidence shows that the plaintiff is entitled to a commis-
sion of fifty-two percent of the margin over cost.

Interpreting the term keystone markup in accordance with the parties' intentions is not a difficult task. The master determined, based on the testimony of Cormier, Noyes, and others, that keystone markup is "a retail pricing term that refers to a doubling of outside costs;" *i.e.*, the cost of the goods when they reached Cormier's warehouse door. The master stated that keystone markup refers to costs "in the door." The amount to be doubled thus excludes Cormier's own internal costs (*e.g.*, research and development, insurance, telephones, heat, and rent). Accordingly, we hold that the master reasonably found the twenty-six percent commission to be applicable.

■■■ The master's interpretation is the only reasonable one possible under the circumstances and facts of this case. The pricing of the goods was within Cormier's exclusive control, and we think it would be unreasonable to hold that he could avoid the twenty-six percent commission obligation simply by applying less than a keystone markup. The reasonable interpretation of the contract is that Cormier was expected to apply a keystone markup and that the commission would be based on the sales prices Cormier chose. If the contract term operated as a condition precedent, Cormier could have set sales prices to yield less than a 100% profit, thereby depriving the plaintiff of the specified twenty-six percent sales commissions.

Cormier's interpretation of the keystone markup, which we reject, seems intended to make the payment term so unreasonable that it cannot be applied and should be deemed missing. The defendant argues that, in the absence of a payment term, parol evidence indicates the plaintiff is entitled to a fifty-two percent commission on net profits from the sale of new inventory. He contends that this accords with the contract's amendment, which pertains to old inventory and the L. L. Bean goods, and reflects the true intent of the parties. Nevertheless, as we have held, the meaning of the term keystone markup is clear, and commissions are based on twenty-six percent of sales originated by the plaintiff and twenty percent of sales not originated by the plaintiff.

We next address the defendant's argument that the master erred in including in the damages award the value of unsold inventory transferred by the plaintiff to Cormier because the contract states that the plaintiff would be paid upon the sale of the old inventory. He contends that paragraph two of the agreement, which states that payments "[shall be] made upon sale of said inventory by Cormier, and receipt of payment therefor," expressly provides that the plaintiff was not to receive payment for the transferred inventory until it was sold.

█ The parties and the master do not dispute the express terms of the agreement regarding payment for the transferred inventory. The issue, however, is the proper remedy in view of the contract breach. The plaintiff objects to Cormier's present offer to return the unsold inventory, and contends that Cormier acted in bad faith in failing to attempt to sell the inventory or to return it to the plaintiff at an earlier date. *See* RSA 382–A:1–203. The facts of this case indicate that the plaintiff has been stymied in its effort to mitigate damages, *see Emery v. Caledonia Sand and Gravel Co.*, 117 N.H. 441, 448, 374 A.2d 929, 934 (1977), because the plaintiff could have attempted to sell the inventory had it been returned. Hence, we agree with the plaintiff that Cormier's offer to return the inventory will not provide adequate relief, and affirm the master's decision, which was intended to place the plaintiff in the position it would have been in had the contract not been breached. *Lahey v. Shaw*, 123 N.H. 648, 651, 466 A.2d 911, 914 (1983).

█ Finally, we address the defendant's claim that the master erred in refusing to subtract bad debts in determining the commissions due to the plaintiff on new inventory sales. He argues that the master failed to find that the parties stipulated to the amount of bad debts. We disagree. The master stated on the record that due to inaccurate record-keeping on the part of both parties, he could not calculate with certainty the amount of bad debts. The master did not deduct bad debts in determining the value of new inventory sales, and awarded the plaintiff twenty-six percent commissions on total new inventory orders shipped.

██ The law in New Hampshire is that damages need not be proven with absolute certainty. *Dunlop v. Daigle*, 122 N.H. 295, 300, 444 A.2d 519, 522 (1982). Since evidence exists to support the amount of damages awarded by the master, *M. W. Goodell Const. Co., Inc. v. Monadnock Skating Club, Inc.*, 121 N.H. 320, 323–24, 429 A.2d 329, 331 (1981), we affirm the master's award.

*Affirmed.*

All concurred.