Hillsborough
No. 87-329

ERIN FOOD SERVICES, INC.

v.

DERRY MOTEL, INC.

December 30, 1988

*Gallagher, Callahan & Gartrell P.A.*, of Concord (*James L. Kruse* and *Mark T. Broth* on the brief, and *Mr. Broth* orally), for the plaintiff.

*Malloy & Sullivan*, of Manchester (*Donald A. Kennedy* on the brief and orally), for the defendant.

SOUTER, J. In this appeal from an order of the Superior Court (*C. Flynn*, J.) requiring specific performance of a real estate option contract, the defendant-seller claims that the plaintiff-buyer breached the agreement by failing to satisfy an affirmative obligation to obtain required subdivision approval and by failing to make tender of performance that was both timely and adequate in other respects. The defendant claims further that specific performance is inappropriate in light of the significant appreciation in the value of the land between the dates of the contract and the trial court's order. We affirm.

In 1982 and prior thereto, the defendant, Derry Motel, Inc., owned a tract of land located near the intersection of N.H. Route 102 and Interstate Route 93 in Londonderry. In March of that year, Derry Motel granted an assignable option to George Matarazzo, acting for Land Use Group, Inc., to purchase an approximately 18-acre portion of the tract, and in the following year conveyed the remaining 4.3 acres to David Murray, the principal of the plaintiff, Erin Food Services, Inc., who built a Burger King restaurant on the land.

One acre of the parcel subject to option was under lease to the Shell Oil Company for the operation of a filling station, and the remainder was used as a site for a motel. The terms of the option entitled Land Use, for approximately one year, to purchase the entire tract for $650,000, or the motel site exclusive of the acre leased to Shell for $500,000. In the event that Land Use exercised its right to extend the option for a further year, it was entitled during that period to buy the whole parcel for $700,000 or the motel site alone for $500,000. Derry Motel and Land Use did agree on a one-year extension, and in September, 1983, Land Use assigned its rights to Erin, which wrote to Derry Motel in March, 1984, exercising the option to buy the motel site, exclusive of the filling station's acre.

Derry Motel's principals, John Janigan and his brother, were by that time reluctant to sell. After receiving Erin's communication, the Janigans kept silent until April 11, when Derry Motel's then counsel wrote to counsel then representing Erin claiming that the agreement had expired prior to Erin's purported exercise of its option, and claiming further that the motel had become subject to a lease encumbering its title. Actually, John Janigan had proposed to enter into the lease agreement only after receipt of Erin's letter exercising the option, and he later admitted that he knew his counsel was wrong in claiming the exercise to be untimely, but had declined at first to correct the mistake, in order to keep pressure on Erin. By April 16, however, Derry Motel's counsel had acknowledged the timeliness of Erin's action, and the parties were ostensibly ready to proceed to effect the conveyance.

Their disagreements were not all behind them, however, and it is well to note here the provisions of the option agreement on which the parties' contentions would later focus. Under its terms, a closing would be scheduled to occur twenty days after notice by Land Use (for which we will hereinafter substitute Erin) of its exercise of the option, and the agreement provided that "[a]ll times, wherever specified herein, are of the essence of this Agreement." Derry Motel was obligated to produce a warranty deed "conveying good and clear record and marketable title free from all encumbrances," except for certain easements not here relevant.

The agreement provided that if Shell Oil exercised a right of first refusal to purchase the acre subject to its lease (an event that never occurred, since Erin never exercised its option with respect to the Shell site), Derry Motel would be responsible for subdividing the tract. Except in the event either of Shell's exercise of first refusal or of Erin's decision to acquire only the motel site without Shell's

leased acre, the option provided that Derry Motel would convey the tract "in its entirety; however, nothing herein shall be deemed to prevent [Erin] from obtaining a subdivision or subdivisions of the Premises prior to the acquisition and conveying portions of the premises at closing . . . at [Erin's] sole discretion." It was agreed that Erin "may apply to any local, county, state and/or federal boards, agencies and authorities for development approvals, subdivision, resubdivision, building permits, and any other approvals, required to use the Option Premises or any portion thereof as may be required by [Erin] . . . . Derry Motel . . . agrees to execute a Special Power of Attorney permitting [Erin] to execute such applications." Such a power of attorney was in fact given to Erin.

It will be noted that none of the quoted provisions expressly allocated an obligation to obtain the local subdivision approval that would be required in the event Erin chose to buy the motel site without Shell's acre, and starting in April, 1984, the parties disputed whose responsibility it was. In July, the stalemate supposedly ended with agreement to cooperate in obtaining the subdivision approval, after which Erin's counsel did some work in preparing an application. When he had not submitted an application to the Derry Planning Board by October, however, John Janigan did so. He also appeared with Murray at a November board hearing on the application, and at a meeting on December 5, 1984, the board granted subdivision approval subject to a condition that the existing motel building be razed within one year. (No issue about the commencement of the one-year period is in contention before us, and we assume that the time is meant to run from the date of any subdividing conveyance of the motel site.)

Derry Motel did not wait for the subdivision approval, however, before pressing to close the transaction. In July, its counsel proposed an August closing with escrow of funds, subject to a condition that Erin would make the additional purchase of the Shell acre if subdivision approval had not been obtained within a year. When Erin expressed willingness to agree to an escrow closing but declined to accept the condition, Derry Motel proposed a September closing subject to a new agreement that the escrow could be terminated and the option cancelled if the subdivision had not been approved by November 1, 1984. Again, Erin said no. Derry Motel then demanded an October 1 closing regardless of the status of the subdivision request, with the transaction to be rescinded if the subdivision was later denied. After October 1 had passed with no closing, Derry Motel's counsel demanded a closing on November 13, without postponement, noting that a preliminary hearing on

subdivision had been scheduled for November 8 and that official indications boded well for approval. In reply, Erin's counsel expressed fatigue induced by Derry Motel's serial demands for a closing prior to fulfilling its obligation to obtain subdivision approval, and undertook to close on the transaction within forty-eight hours of final subdivision approval.

On November 7, the planning board indicated that subdivision approval would be conditioned, *inter alia*, on razing the motel. Whereupon, Derry Motel's counsel again demanded a closing on November 13, but subject to three options among which Erin might choose: to take the entire tract but pay nothing for the Shell acre, which would be reconveyed "upon subdivision"; to take the entire tract "and proceed with a variance request," giving a promissory note for the price of the Shell site, to be paid if there was no reconveyance within a year; or to refuse to close, "thereby terminat[ing] our tenuous agreement." Erin declined to accept the options. On November 13, Erin's counsel expressed his hope that the planning board's condition could be liberalized, and counsel for Derry Motel demanded a closing on December 12, again subject to conditions not contained in the option agreement.

Final subdivision approval was granted on December 5, but was accompanied by the condition that the motel be razed within a year. Although there was no closing on December 12, the plaintiff decided to accept the one-year condition and counsel for the parties set December 19 as a closing date, recognizing, however, that there could be delay if Murray was not able to return by then from out of State. Although the necessary funds had been deposited in a local bank by the 19th, Murray and Erin's counsel had apparently not met for Murray to sign the various documents and deliver the appropriate checks. On the 19th, however, counsel for the parties did agree upon final changes in closing documents, and set December 20 as the definite closing date.

Although Murray and Erin's counsel still has not met by December 20, Erin's counsel telephoned counsel for Derry Motel to say that he would have the documents signed, and would deliver them with the checks, by the next day. Later on the 20th, however, Derry Motel's counsel called back to advise that Derry Motel had repudiated the agreement, and he confirmed this the same day with a certified letter stating that "by virtue of your client's failure to close on December 12, 1984 as per my letter of November 13, 1984, they [i.e. the Janigans] consider your client to have elected to treat the contract as terminated." A postscript advised that "[t]he property will soon go back on the market at a price reflective of

the increase in property values since the initial option was granted to Matarazzo. Should your client renew his interest in these Premises, I suggest he contact John Janigan directly."

Despite the repudiation, on December 21 Erin's counsel went to the office of counsel for Derry Motel with documents executed on his client's behalf and a series of checks, the largest of which was payable to the order of himself. The office was locked, however, and a Christmas party was in progress inside. When Erin's counsel could rouse no one to come to the door, he left copies of the documents and checks, which Derry Motel's counsel found on December 23. Although Erin continued thereafter to express its desire to complete the transaction in accordance with the option, Derry Motel refused. In due course, Erin filed its bill in equity seeking specific performance, and this appeal followed the superior court's decree in Erin's favor.

■ Because the parties' contractual disharmony centers largely on the efforts to obtain subdivision approval to effectuate the option as Erin chose to exercise it, we begin our review with Derry Motel's contention that Erin was the breaching party in failing to obtain that approval within a reasonable time. There is no dispute that the town of Londonderry had adopted regulations requiring approval for the subdivision of land, and no dispute that Erin's exercise of the option to buy the motel site exclusive of Shell's acre entailed a subdivision as a condition for the conveyance thereby required. As a matter of State law, therefore, any sale of the motel site alone without subdivision approval would have been subject to injunction. RSA 676:16. That being so, Derry Motel's obligation to transfer "good and clear record and marketable title" carried with it an obligation to obtain that subdivision approval, without which there could be no marketable title to any separate portion of the tract to be subdivided.

As against this straightforward analysis, Derry Motel's argument that the parties had agreed to shift the obligation onto Erin's shoulders is entirely unavailing. The contract, as we observed before, does not expressly provide anything about the burden to get approval in the event that Erin's exercise of the option should necessitate a subdivision. While it is true that the option requires Derry Motel to authorize Erin to apply for subdivision approval, Erin's choice to make such an effort is left entirely to Erin's discretion. This, indeed, is entirely consistent with the option provision quoted above that indicates Erin was empowered to seek subdivision approval simply to allow it to make an expeditious subdivision of whatever it might choose to buy.

Nothing in the option contract, then, implies that Erin had become burdened with the responsibility to place Derry Motel in a position to transfer marketable title, and none of the parties' subsequent dealings appear ever to have amended this feature of the agreement. The nearest they ever came to such a contractual modification was a proposal from Erin's counsel for a closing in escrow prior to subdivision approval, coupled with Murray's undertaking to attempt to get the approval. This proposal never matured into an agreement, however, because Derry Motel's counsel responded by requesting escrow terms that would have given his client certain rights to rescind the agreement, and such terms were unacceptable to Erin. The upshot is that the legal obligation to obtain the approval never shifted from Derry Motel to Erin, and the most that can be said is that Erin agreed to cooperate with Derry Motel in making the required application to the planning board.

Our conclusion in Erin's favor on this issue is, however, subject to one loose end in the record before us, for the trial court denied Erin's requested finding that under the option Derry Motel was obliged to obtain subdivision approval if Erin chose to purchase the motel tract without the Shell site. This seems to have been an oversight, however, since the court in its comprehensive narrative of findings and rulings concluded that Erin had no obligation to purchase the property before Derry Motel had obtained clear title, which did not occur until the planning board had acted on December 5. Thus, we read the trial court's understanding of the contract as being consistent with our own, that the burden to obtain the approval rested on Derry Motel, and that Erin had no affirmative obligation beyond one of cooperation.

The responsibility that must therefore be charged to Derry Motel for delay in obtaining the subdivision approval has further bearing on its next contention, that Erin breached the option by failure to perform within the time allowed, when time was of the essence of the agreement. *See generally Mailloux v. Dickey*, 129 N.H. 62, 66, 523 A.2d 66, 69 (1986) (time normally not of essence unless agreement specifically so states); *Guy v. Hanley*, 111 N.H. 73, 75, 276 A.2d 1, 3 (1971) (whether time essential to be determined by reference to instrument and all surrounding circumstances). Needless to say, Derry Motel does not claim that the option's provision for a closing within twenty days was enforceable, not when Derry Motel itself had affected for an even longer period to ignore Erin's admittedly timely notice. *See Famous Players Co. v. Salomon*, 79 N.H. 120, 122, 106 A. 282, 283 (1918) (promisee who

prevents performance may not predicate claim for relief upon promisor's failure to act). But even if Derry Motel had made a prompt acknowledgment of Erin's decision, it could not reasonably have insisted that a closing within twenty days was essential, for the simple reason that a subdivision application could not possibly have been prepared, filed, and acted upon within that short period. Indeed, the only practical construction of the twenty-day requirement would apply it to a sale of the entire tract requiring no governmental approvals, but not to a conveyance requiring approval to subdivide.

■ Since the contract did require subdivision on the facts of this case, it failed in effect to specify any performance date or formula for determining such a date, and was therefore subject to the general rule that a contract lacking a designation of specific time for performance obligates the parties to perform within a reasonable time. *Smith v. B., C. & M. Railroad*, 36 N.H. 458, 485 (1858). And because the possibility of performance turned on obtaining the subdivision approval, Erin had a reasonable time thereafter to tender the consideration agreed upon.

Derry Motel asks us to modify this general standard of timely performance by adopting a rule, recognized in some form by the text writers, that subsequent to a contract's formation one party may render performance by a given date essential, simply by insisting on it early enough to give the other party a reasonable time to prepare to complete the transaction by the date selected. *See* 6 S. WILLISTON, CONTRACTS § 856, at 231 (3d ed. 1962) (though not originally of the essence, time may be made so by later notice requiring completion by particular date, if time allowed is reasonable); 3A A. CORBIN, CONTRACTS § 723, at 382 (1960) (specified date may be made essential by notice to that effect, leaving a reasonable time for performance). Thus, in its brief, Derry Motel argues that "Derry Motel . . . took the position that time was of the essence as to each of the postponements [preceding December 20]. Derry Motel's actions are consistent with this intent."

Even if we were to recognize such a rule, however, it would not avail Derry Motel on the facts of this case. Until December 5, 1984, of course, Derry Motel's repeated demands for closings rang hollow, for until the subdivision approval had been obtained, Derry had not placed itself in a position to transfer the marketable title it had agreed to provide (and we know of no reason to suppose that even then Erin was bound to accept the conveyance subject to an obligation to raze the motel within a year). Up to that point, indeed,

Derry Motel's calls for closings were nothing more than requests to Erin to settle for something less than it was entitled to get under the option.

Although the general rule of reasonable time was not, therefore, supplanted by Derry Motel's designation of an essential date, it was subsequently modified by the joint act of the parties, who, the trial court found, reached agreement after December 5 that a closing should take place on December 20. While the testimony indicates that the date was considered a definite one, the evidence hardly required the trial court to find that it was definite to the point of being essential, and two items of evidence indicate that no one on Derry Motel's side of the case ever believed that it was. We have already quoted the letter of December 20 from Derry Motel's counsel repudiating the agreement. If he had then believed that time was of the essence of the agreement to close on the 20th, he would naturally have said so. But he did not. Instead, as we have seen, he claimed that the failure to close the week before, on "December 12, 1984 as per my letter of November 13, 1984," was the reason that the Janigans "consider[ed Erin] to have treat[ed] the contract as terminated." A second noteworthy item of evidence was Derry Motel's counsel's memo to his file after finding the copies of checks and documents left outside his locked office during the Christmas party. Although he wrote that he had advised John Janigan that "no appropriate tender had been made," he memorialized no thoughts about untimely performance or any agreement that a closing on December 20 was essential, and the trial court was free to find that he never understood such an agreement to have been made.

■ Since no error taints the finding that time was not of the essence as to the date of December 20, the rule to be applied is that the party seeking enforcement must have been ready to perform within a reasonable time of the date specified, provided delay was not willful or harmful to the other party. *Johnson v. Korsak, Inc.*, 120 N.H. 412, 415, 415 A.2d 1141, 1143 (1980); *Leavitt v. Fowler*, 118 N.H. 541, 543, 391 A.2d 876, 877 (1978). Suffice it to say that nothing in the record requires the finding that a one-day delay from the date agreed upon offended this rule. (For that matter, even if the parties had not agreed upon December 20, the trial court would not have been compelled to find that a delay from December 5 to December 21 exceeded the limits of reasonableness.) To be sure, the delay would have been irritating to any seller, and to the Janigans, who had long before repented themselves of their agreement, it proved to be exasperating. But such is not the touchstone of breach,

and the trial court was under no compulsion to find that a want of timeliness barred Erin from seeking enforcement.

Before leaving the discussion of timeliness, however, we should make passing note of Derry Motel's argument that a novation occurred, which superseded the original option agreement, *see generally Skandinavia, Inc. v. Cormier*, 128 N.H. 215, 219, 514 A.2d 1250, 1253 (1986), and which called for performance by December 20, as an essential term. We can only say that Derry Motel's evidence for December 20 as the time-essential date under a novation is the same evidence we have just discussed, which is no more convincing in this new context. In any event, Derry Motel raised no claim of novation in the superior court and may not do so here. *Daboul v. Town of Hampton*, 124 N.H. 307, 309, 471 A.2d 1148, 1149 (1983).

■■ We may deal just as shortly with Derry Motel's third attempt to convince us that Erin had no claim for relief, for the reason that Erin's counsel made no adequate tender of performance in leaving the copies of certain documents and checks pinned to the door of Derry Motel's counsel's office on December 21. What Derry Motel ignores is the rule excusing formal tender to a party whose repudiation of a contract has previously indicated that tender would be a useless act. *Lowell v. First Church of Christ*, 101 N.H. 363, 366, 143 A.2d 671, 674 (1958). Derry Motel's repudiation on December 20 thus left Erin free to seek enforcement so long as it could establish its readiness, willingness, and ability to perform its side of the bargain, *Hogan v. Leary*, 115 N.H. 88, 90, 333 A.2d 724, 727 (1975), as the trial judge found to be the case.

We are left with Derry Motel's final contention, turning not on the adequacy of Erin's performance under the agreement, but on the appropriateness of granting equitable relief in the form of a decree of specific performance, the customary remedy for a seller's breach of contract to convey land. *Chute v. Chute*, 117 N.H. 676, 678, 377 A.2d 890, 891 (1977). Although Derry Motel recognizes the propriety of specific performance where it is not barred by impossibility or inequity, *see Continental Cablevision of N.H. v. Osgood Lodge*, 123 N.H. 215, 219, 459 A.2d 263, 266 (1983), it claims that Erin's dilatory conduct and a significant appreciation in the value of the land since the execution of the option each disqualify Erin on equitable grounds from receiving such relief.

The charge that Erin dragged its feet so far as to bar equitable relief rests, of course, on the assumption that delay in obtaining the subdivision approval should be charged to Erin. At this point, it is sufficient to say that the reasons given earlier for sustaining the

trial court's contrary conclusion will explain why we do not view Erin as so bereft of equity here.

The claim that appreciation in the land's value since the date of the option agreement should bar specific performance does raise a new issue, however. Factually, Derry Motel rests its argument on comparing the option price of $500,000 with an appraisal of $1,500,000 in December, 1984, when the parties agreed to close the transaction, and of $2,850,000 in November, 1986, prior to the trial of this case. Derry Motel relies on this evidence to invoke the holding of *Wehringer v. Bullen*, 120 N.H. 446, 447, 417 A.2d 1, 2 (1980), which it seeks to characterize as a rule that specific performance of a land contract will be denied when an increase in the land's "value . . . is so dramatic and so unforeseen by the parties" that it would "shock the conscience of the court" to decree specific enforcement of the contract. This, however, states *Wehringer* too loosely.

*Wehringer* was a proceeding for specific performance of a land contract made by a seller found by the trial court to have been recently widowed and emotionally weakened, who, without benefit of counsel, agreed to sell for $30 an acre land that was worth $200 an acre at the time the contract was executed. The trial court denied specific performance, and this court affirmed. But, in the opinion's reasoning, the significant comparison was not the difference between the contract price and the value at the time of the enforcement proceeding, but the difference between the contract price and the value on the date of the contract.

*Wehringer* is therefore no authority for refusing specific enforcement of a bargain that proves to be highly advantageous to the buyer. On the contrary, we not only have held that a seller's improvidence alone will not defeat specific performance, *Emerson v. King*, 118 N.H. 684, 394 A.2d 51 (1978) (option to reacquire land at price of original purchase twenty-six years earlier), but have required specific performance of an agreement even though the cost to the defendant would be nearly three times its cost at the time the agreement was made, when delay in its performance was caused by the defendant himself, *Hanslin v. Keith*, 120 N.H. 361, 364, 415 A.2d 329, 331 (1980).

The case before us bears comparison with *Emerson* and *Hanslin*, not with *Wehringer*. Although the Janigans negotiated the original option agreement without employing a lawyer, they were men of business, John Janigan being a graduate of Harvard Business School, a former dealer in real estate, and a licensed real estate broker who was to be paid a commission in connection with the

conveyance in issue. There is no evidence that this agreement was not made at arm's length or was in any sense unconscionable or inequitable when made, and the terms of its one-year extension demonstrate that the Janigans understood the trend of real estate values to rise. The reasons for not completing the transaction and receiving their money within the time they might reasonably have expected included their own refusal to acknowledge an admittedly valid exercise of the option, their failure to obtain an expeditious subdivision approval that was their responsibility, and their repudiation of their entire contractual obligation, thereby forcing Erin into three-and-a-half years of trial and appellate litigation.

Equity will not refuse specific performance of a bargain merely because it has proven unexpectedly advantageous to a plaintiff, and equity may not refuse specific performance of a bargain merely because a defendant has resisted its enforcement to his own disadvantage.

*Affirmed.*

All concurred.