NIKI KAKRIS, EXECUTRIX
OF THE WILL OF CHRISTINA KAKRIS

v.

ARMAND MONTBLEAU
AND THE TOWN OF PELHAM

May 23, 1990

*Sullivan, Gregg & Horton P.A.*, of Nashua (*James L. Sullivan, Jr.*, on the briefs and orally), for the plaintiff.

*Gottesman & Hollis P.A.*, of Nashua (*Paul M. DeCarolis* on the briefs and orally), for the defendant Armand Montbleau.

*Soule, Leslie, Zelin, Sayward & Loughman*, of Salem (*Gordon B. Graham* and *Diane M. Gorrow* on the briefs, and *Mr. Graham* orally), for the defendant Town of Pelham.

THAYER, J. This case is before us on appeal from an order of the Superior Court (*Mangones*, J.) approving the Master's (*John J. Ryan*, Esq.) report and recommendation to quiet title to a twenty-acre tract of land in defendant Armand Montbleau and to deny plaintiff Niki Kakris' petition to quiet title and to set aside conveyance. For the reasons that follow, we affirm.

In 1957, Christos and Christina Kakris purchased roughly eighty-three acres of land known as the "Old Gould Farm" located off Spaulding Hill Road in the town of Pelham. They began to sell portions of this original eighty-three-acre parcel in 1963, when they entered into what was essentially a contract for deed to sell twenty acres of land to Frank and Elizabeth Berry, pursuant to which the Berrys were responsible for and paid the property taxes on the twenty acres and the Kakrises held the deed until full payment was made in 1968. In addition to the Berry conveyance, the Kakrises sold approximately 39.5 acres of land to Henry and Lucy Seamans in 1964. The Kakrises, in 1968, conveyed a two-acre parcel of land to their daughter, Niki, and to themselves. Christos Kakris died in 1973, and the two-acre tract was transferred in 1974 by Niki and Christina to Niki individually.

The relevant town tax records reflect that from 1958 until 1962 the Kakrises owned the eighty-three acres of land; all property taxes were assessed to and paid by them. The 1963 records indicate that twenty of the original eighty-three acres were sold to the Berrys and were to be taxed to them, while the taxes on the remaining sixty-three acres were the responsibility of the Kakrises. The 1964 tax records recognize the transfer of the 39.5 acres to the Seamans, and indicate that the Kakrises were assessed that year as follows: "75

acres, land, Spaulding Hill Road—$1,700.00—sold to Seamans 39 ½ acres plus house. One acre, land and buildings, Spaulding Hill Road, $4,550.00—sold to Berry 22 ½ acres." (There is also a notation on the tax blotter which says "rest is in error.") But from 1965 until 1968, even though subtraction of the Berry and Seamans conveyances from the original eighty-three-acre parcel should have left the Kakrises with at least a twenty-acre tract of land, no taxes whatsoever were assessed to the Kakris family. Apparently, the town was operating under the mistaken assumption that the Kakrises had sold all of their holdings and no longer owned any taxable property in Pelham. Then, in 1968, the Kakris name was once again listed in the tax rolls, this time as owner of a two-acre parcel of "Back land off Spaulding Rd., part Gould Farm." This, presumably, refers to the intra-family conveyance from Christos and Christina Kakris to Niki Kakris and to themselves in 1968, and to Niki individually in 1974. From 1968 until the present, a member of the Kakris family has paid the property taxes on this particular two-acre parcel. No one, however, has filed any inventories for, paid any taxes on, or made any inquiries concerning ownership of the currently disputed twenty-acre tract of land. The subject property disappeared entirely from the tax rolls in 1965, and did not reappear until 1981, when the tax map for the town of Pelham was completed. Evidently, once the tax map was completed, the town became aware of a number of parcels of land whose owners were unknown and for which no property taxes had been assessed or paid.

In 1982, in accordance with RSA 73:20, the land in question, designated as Lot 001-142 on the tax map, was taxed to "owner unknown." When the taxes were not paid, the town conducted a tax sale pursuant to RSA chapter 80. Defendant Armand Montbleau purchased the land for unpaid taxes and, at the conclusion of the mandatory two-year redemption period, received a tax collector's deed to the property.

In 1985, Christina Kakris filed a petition to quiet title and to set aside conveyance after her daughter, Niki, received an anonymous phone call informing Niki that the Kakris family owned more than two acres of land in Pelham, but that it had been sold at a tax sale. After Christina's death in 1986, Niki Kakris, as executrix of her mother's estate, was substituted as party plaintiff.

In her petition, the plaintiff complained that the town of Pelham failed to meet the statutory notice requirements pertaining to the conveyance of a tax collector's deed and delineated in RSA 80:38-a

(Supp. 1989). She further contended that the actions of the town created a situation where, as a matter of equity, the tax sale should be reformed and she should be awarded the property. With respect to the notice issue, the master specifically found that the town of Pelham "met the statute," which simply required the town "to make an effort to reasonably ascertain [the identities of] the current property owners from the information available to the Town in its tax warrants or property inventories." With respect to the equity claim, the master found that the plaintiff did not meet her burden of proof in that "the evidence justifie[d] the conclusion that the Kakris family had the best and the only realistic opportunity to correct the situation, and that neither the actions of the Town or Mr. Montbleau contributed to the eventual loss of the Kakris' property rights to the subject parcel."

On appeal, the plaintiff complains that she was denied due process because the town failed to give her, as owner of the property, notice before the tax collector's deed was given to defendant Montbleau. She argues that the court below erred in quieting title in Armand Montbleau, claiming (1) that the town knew or should have known that the Kakris family owned the property; (2) that no notice was ever sent in accordance with RSA 80:38-a (Supp. 1989); and (3) that, even if notice was sent, the town's failure to exercise reasonable efforts to locate the owner, coupled with notice to "owner unknown," was insufficient to meet the statutory notice requirement. Both defendants, the Town of Pelham and Armand Montbleau, contend that the constitutional issue of due process was not raised below and, therefore, cannot be argued on appeal. In the alternative, they claim that the town's actions complied with the statutory notice mandates and satisfied the constitutional requirements of due process.

After oral argument on the issues discussed above, we requested that the parties submit supplemental briefs and reargue the specific question of the effect on the disposition of this case, if any, of both the inaccuracy of the town's tax records as to the holdings of the Kakris family and "the obligation to and failure of plaintiff's predecessors in title to file inventories, pay tax, or make any inquiry concerning ownership of the disputed parcel, as both relate to the issue of the town's obligation and ability to determine ownership of the property from its records." The plaintiff contends that the unfortunate chain of events that ultimately led to the loss of her land through tax sale is directly traceable to the disappearance of the land from the town's tax rolls. She claims that the town was respon-

sible for the inadvertent disappearance of the twenty-acre tract from the tax rolls and that this loss was the "prime and direct cause" of the town's subsequent inability to ascertain the owner of the property. In addition to this "causation argument," Ms. Kakris also claims that the town had a statutory responsibility to forward inventories to the taxpayers, and that, having failed to do so, the town must share responsibility with the Kakris family for the fact that the requisite inventories were not filed. The plaintiff argues, in the alternative, that the Kakrises were statutorily excused from filing the annual inventories due to accident, mistake, or misfortune. Finally, the plaintiff argues that her family's and her own failure to return inventories, pay taxes, or make any inquiry or investigation concerning the ownership of this disputed parcel of property had little or no material effect on the inability of the town to locate the record owner. She insists that when all of the facts of this case are considered, the acts of the town in setting aside the land and not having it on the tax rolls, evaluated in light of the fact that the town failed to ascertain later the owner of the subject property, far outweigh any inaction on the part of her family or herself.

Not surprisingly, the defendants strongly disagree with the plaintiff's analysis of the various events that resulted in the land being sold at tax sale and with her final assessment of the situation regarding the placement of blame and responsibility. It is the defendants' position that the inaction of the Kakris family was the primary cause of the town's inability to determine ownership of the land. Both the town and Mr. Montbleau maintain that responsibility for the loss of the subject property rests solely with the Kakrises.

 Before we reach the other issues raised by this case, we are able to dispense quickly with plaintiff's contention that the town violated RSA 80:38-a (Supp. 1989) by not sending any notice of the impending deed transfer. Whether notice was sent is obviously a question of fact, one left to the determination of the master. "We will not disturb the findings of the master unless they are unsupported by the evidence or are erroneous as a matter of law." *Demetracopoulos v. Strafford Guidance Ctr.*, 130 N.H. 209, 213, 536 A.2d 189, 192 (1987); *see Skandinavia, Inc. v. Cormier*, 128 N.H. 215, 220, 514 A.2d 1250, 1254 (1986). After all, "the master is in the best position to observe the parties, evaluate the evidence, and assign credibility to the testimony." *In re Adoption of Baby C.*, 125 N.H. 216, 225, 480 A.2d 101, 106 (1984). The evidence supports the master's findings when the record discloses "evidence from which a rea-

sonable person could have made such findings." *Town of Plaistow v. Nadeau*, 126 N.H. 439, 442, 493 A.2d 1158, 1161 (1985).

■ At trial, the town clerk and tax collector, Cheryl B. Rossi, was specifically asked if she "had sent out the notice before executing, delivering the deed to Mr. Montbleau of Lot 142." She recalled having sent "certified notices of the tax sale to 'Owner Unknown,' Spaulding Hill Road." Although there was some confusion about whether counsel's questions referred to the mailing of certified letters giving notice of the actual tax sale or to notice of the subsequent deeding, Ms. Rossi, in response to a question from the master, testified that RSA 80:38-a notice was indeed sent. In his findings of fact, the master concluded that "the Town of Pelham sent notice to 'Owner Unknown' at Lot 001-142 that Lot 001-142 was going to be deeded to Armand Montbleau." We conclude that there is ample evidence in the record to support this decision.

■ We now turn our attention to the question of whether plaintiff's due process argument was properly raised below, as "it is well established that this court will not consider issues raised on appeal that were not presented in the lower court." *State v. Laliberte*, 124 N.H. 621, 621, 474 A.2d 1025, 1025 (1984); *see Topjian Plumbing & Heating, Inc. v. Bruce Topjian, Inc.*, 129 N.H. 481, 486, 529 A.2d 391, 394 (1987). Clearly, the plaintiff did not challenge below the constitutionality of the statute itself. In fact, in light of our previous determination that RSA chapter 80, when read in conjunction with the notice requirements mandated therein, is indeed constitutional, *White v. Lee*, 124 N.H. 69, 78, 470 A.2d 849, 854 (1983), any such challenge would have been futile. This court concludes, however, that the argument below, claiming failure by the town to comply with the statutory notice requirement, was sufficient to trigger a due process inquiry relevant to the notice issue. Embodied in the very concept of notice are principles associated with constitutional due process. Therefore, we will address the question of whether the town's actions as they related to the notice requirement of the statute violated the plaintiff's due process rights.

■■ "It has long been the law in this state that the power and authority of a tax collector to sell land for unpaid taxes is exclusively statutory." *Dowd v. Gagnon*, 104 N.H. 360, 361, 187 A.2d 63, 64 (1962). As long as "the collector has complied with the requirements of the statutes necessary to the exercise of his power to sell the land of a delinquent taxpayer, his deed conveys a valid title to the[ ] prem-

ises." *Id.; see White v. Lee*, 124 N.H. at 76, 470 A.2d at 853. The particular statute at issue, RSA 80:38-a (Supp. 1989), provides in relevant part that "[a]t least 30 days prior to executing the deed under RSA 80:38, the tax collector shall notify the current owner of the property or his representative or executor, by certified mail, return receipt requested, of the impending deeding." The facts of this case indicate that notice was sent to "owner unknown." Plaintiff contends that such notice was insufficient because the town did not make reasonable efforts to ascertain the owner of the subject property and because the notice was not calculated or expected to apprise the true owners of the impending deeding.

It is beyond dispute that the due process clause requires "that deprivation of life, liberty or property by adjudication be preceded by notice and opportunity for hearing appropriate to the nature of the case." *Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 313 (1950). In fact, the United States Supreme Court has consistently recognized that "[a]n elementary and fundamental requirement of due process in any proceeding which is to be accorded finality is notice reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." *Id.* at 314; *see Mennonite Bd. of Missions v. Adams*, 462 U.S. 791, 795 (1983). In an action concerning title to real property, "[n]otice by mail or other means as certain to ensure actual notice is a minimum constitutional precondition to a proceeding . . . if [the owner's] name and address are reasonably ascertainable." *Mennonite*, 462 U.S. at 800.

Therefore, the inquiry must focus on whether or not the town acted reasonably. Plaintiff claims that the town was in the best position to determine the identity of the owner of Lot 001-142, that its efforts to do so were inadequate, and that the resulting notice to "owner unknown" violated due process. As support for this position, plaintiff primarily relies on the United States Supreme Court case of *Mennonite Board of Missions v. Adams supra*, and our own New Hampshire case of *White v. Lee supra.*

In *Mennonite*, in order to secure a financial obligation, the owner of certain property executed a mortgage in favor of the appellant Mennonite Board of Missions (MBM). When the owner failed to pay the property taxes, the State, pursuant to statute, sold the land at tax sale. Even though the mortgagee of the property to be sold was clearly identified in the recorded mortgage, the State did not notify MBM of the sale. The Court found that the circumstances of the case

were such that constructive notice through publication was wholly insufficient to satisfy due process because the mortgagee's identity was easily ascertainable, and the inexpensive and more efficient mechanism of mail service was readily available. *Mennonite*, 462 U.S. at 798. Simply put, the Court held that if actual notice is a reasonable, viable option, the use of the less reliable publication form of notice is constitutionally inadequate. *Id.* at 799.

This court found the *Mennonite* case to be particularly instructive when we were asked to rule upon the sufficiency and constitutionality of the notice provisions of RSA chapter 80. In *White v. Lee*, we were faced with the question of whether a town is required to give notice to a current property owner whose land is subject to tax sale for delinquent taxes assessed against a prior owner.

In that case, Randy and Katherine White received a two-acre parcel of land from Katherine's great-grandmother, Pearl Chesley. The 1977 property taxes were assessed and mailed to Chesley. When the taxes went unpaid, the mandatory notice concerning the upcoming tax sale also was sent to Chesley. Unfortunately, Ms. Chesley died in 1978 without having informed the Whites of the impending sale. The town failed to send any form of notice to the Whites, "even though they were listed as the owners of the property on the town's current tax warrants." *White v. Lee*, 124 N.H. at 72, 470 A.2d at 851. We held that as the current owners of the subject property, the Whites were clearly interested parties whose interests would be adversely affected by such a sale. We concluded that "individuals, whose names and addresses are reasonably ascertainable from the town's tax warrants and/or current property inventories, must be given actual notice by registered mail of an impending sale." *Id.* at 75, 470 A.2d at 852. We went on to say, quoting from Mennonite, that "[l]ess reliable forms of constructive notice, such as publication or posting, are not reasonable where 'an inexpensive and efficient mechanism such as mail service is available.'" *Id.*

Although both *Mennonite* and *White v. Lee* advocate actual notice, they do not require it in every case. The *Mennonite* Court did not suggest "that a governmental body is required to undertake extraordinary efforts to discover the identity and whereabouts of a mortgagee whose identity is not in the public record." *Mennonite*, 462 U.S. at 798–99. Furthermore, this court specifically held in *White v. Lee* that only those individuals "whose names and addresses are *reasonably ascertainable*," 124 N.H. at 75, 470 A.2d at 852 (emphasis added), are entitled to actual notice. *See Mennonite*, 462 U.S. at 800;

*Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. at 314. The practicalities and peculiarities of each case must be taken into consideration. *See Tulsa Professional Collection Services v. Pope*, 485 U.S. 478, 484 (1988). "A construction of the Due Process Clause which would place impossible or impractical obstacles in the way" of vital State interests is not required. *Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. at 313–14. "[W]here it is not reasonably possible or practicable to give more adequate warning," *id.* at 317, substitutes for actual notice comply with the statutory mandates of RSA 80:38-a (Supp. 1989) and satisfy constitutional due process.

With the above discussion in mind, we turn our attention to the facts of the present controversy. The town made great efforts to locate the owners. Cheryl Rossi testified that she "did as much as [she] could to try to locate these people." More specifically, she searched the available tax warrants, assessment records and blotter sheets. She even went so far as to send letters of inquiry to the abutting landowners. Although in a number of other instances, Ms. Rossi was able to ascertain the previously unknown property owners, in this particular case her efforts were unsuccessful; she "never suspected whatsoever that Mrs. Kakris owned this property."

The plaintiff argues that the town had a duty to undertake a more exhaustive search, claiming that a review of the relevant deeds would have identified Mrs. Kakris as the owner. Plaintiff's expert, David Hamilton, testified that anyone looking at the deeds, those from Mason to Kakris, from Kakris to Berry, and from Kakris to Seamans, would have come to the conclusion that there was additional land remaining in the hands of the Kakrises. It is important to note, however, that Mr. Hamilton's inquiry was well-defined and targeted. He had the benefit of a particular name as the starting point for his search, and thus could check all relevant deeds executed by the Kakrises. The fact that the town did not enjoy the same luxury is significant. Mr. Hamilton conceded as much when he indicated that, without the benefit of a name, it would have taken hours for him, a licensed land surveyor familiar with deed descriptions, to determine the true owner.

This court is not unmindful of the fact that "a party's ability to take steps to safeguard its interests does not relieve the State of its constitutional obligation." *Mennonite*, 462 U.S. at 799. Therefore, the fact that the Kakrises may have realized that their property was subject to an annual tax, and may have been able to inquire for themselves into the tax status of the property, did not eliminate the

State's responsibility to provide notice prior to the deed transfer. *See White v. Lee*, 124 N.H. at 75, 470 A.2d at 853. The fact, however, that Christos Kakris knew that he owned the property yet failed to file an inventory, failed to pay the taxes, and failed to inquire of the town as to why taxes had not been assessed certainly contributed to the town's inability to ascertain the owner's identity from the town records.

The same is true of Niki Kakris. She testified that, during the 1950's, her father, referring to his purchase of the Old Gould Farm, told her that the property consisted of "almost a hundred acres." She further testified that, before his death in 1973, Christos Kakris repeatedly told the family about the additional acreage. In fact, he not only told them about the land, but specifically pointed it out to them when they drove by it. Instead of looking into the matter, Niki chose to disregard totally her father's warnings. Even though she had been told that the original parcel consisted of about a hundred acres, and she knew of the twenty-acre conveyance to Berry and the 39.5 acre transfer to Seamans, Niki completely dismissed her father's remarks concerning the additional land, and made absolutely no inquiries about the property. Had Mr. Kakris, Niki or any other member of the family chosen to take some action in this regard, the town would have had the benefit of a particular name when it commenced its search for the unknown owner of Lot 001-142.

▮ We conclude that the town made reasonable efforts to determine the true owners of the subject property and that the notice sent to "owner unknown" was sufficient to satisfy due process. The town gave the best notice it could under the circumstances. "[W]hen notice is a person's due, process which is a mere gesture is not due process," *Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. at 315, but "in the case of persons missing or unknown, employment of an indirect and even probably futile means of notification is all that the situation permits and creates no constitutional bar to a final decree foreclosing their rights," *id.* at 317. Therefore, we hold that due process simply required the town to undertake reasonable efforts, not Herculean ones, to determine the identity of the owner of this property. Since the effort it made by searching the available tax warrants, assessment records and blotter sheets, and by sending letters of inquiry to abutting landowners, was entirely reasonable, the town's ultimate resort to notifying "owner unknown" not only complied with RSA 80:38-a (Supp. 1989), but satisfied due process mandates as well.

We now turn our attention to those issues raised during the supplemental briefing and reargument of this case. Ms. Kakris claims that because the town's tax records were inaccurate, it is primarily responsible for its own inability to determine ownership of the twenty-acre parcel. She argues that the line of causation starts with the disappearance of the property from the tax rolls, and that as a direct consequence of this occurrence, the town was unable to determine the owner of the land. While it is not disputed that the town's records pertaining to the property holdings of the Kakris family were incorrect, the record before us is completely devoid of any explanation for this mistake. As the master noted, "no evidence [was] available at trial as to why the town failed to issue any assessment with respect to the remaining 19 acre parcel." Certainly, no evidence was presented tending to show that the town was in any way at fault. In fact, the master specifically found "that the Town's tax records had attempted to keep pace with the subdivision and ownership of the 83 acre tract."

■ More than twenty years after the error was committed, we can only speculate as to its cause. It is certainly plausible that, as the defendants suggest, the mistake was made in 1963 when the Kakrises entered into the contract for deed to sell twenty acres of land to the Berrys. Pursuant to this arrangement, which continued until 1968 when full payment was made, the Berrys were responsible for and paid the property taxes, but the Kakrises held the deed. It is equally plausible that the error was committed due to some sort of oral miscommunication between the town and Mr. Kakris, which left the town believing that Mr. Kakris and his wife had conveyed all of their property on Spaulding Hill Road. To hold the town accountable solely on the basis of inaccurate records, when not a shred of evidence was presented regarding the genesis of the mistake, would be to establish a *per se* rule holding towns strictly liable for any errors in their records. This we decline to do.

■ The plaintiff also claims that the town was required by statute to forward blank inventories to the Kakrises, and that, having failed to do so, it must share responsibility for the fact that inventories were never filed. This is a circular argument which does nothing to advance the plaintiff's position. It merely reposes the question concerning whether the owner of this property was readily ascertainable, as inventory blanks need be sent only "to the last known address of all persons . . . *known or believed to own* taxable property." RSA 74:5 (1970) (emphasis added) (current version at Supp.

1989). Thus, the town was not statutorily obligated to send inventories to everyone, just to those persons it knew or believed to own taxable property. As we have already held, the owner of this disputed tract of land was not readily ascertainable; the town acted reasonably under the circumstances.

■■■ We are equally unimpressed with Ms. Kakris' alternative argument, that her failure to file inventories as required by RSA 74:7 falls within the embrace of RSA 74:8 (current version at Supp. 1989), excusing her noncompliance with the statute due to "accident, mistake or misfortune." She apparently misunderstands the significance of her family's and her own failure to file the requisite inventories, claiming that "[t]o assess a 'penalty' upon the Kakrises for failure to return inventories which they never received, by denying plaintiff relief, would amount to a superlegislative process by this court." The plaintiff did not lose her property because she failed to file the inventory. She lost the twenty-acre parcel because she failed to pay the property taxes. The Kakris family's failure to file inventories for the land in question is relevant to our inquiry only in that it indicates one point at which the inaccurate tax records could have been discovered and corrected. The Kakrises are not being charged with or penalized for violating the statute. Therefore, the savings provision of RSA 74:8, which excuses failure to comply with the mandates of RSA 74:7, has no application here.

Ms. Kakris' final argument is that her family's and her own failure to file inventories or to investigate or inquire as to the ownership of the property had little or no material effect on the town's inability to locate the record owner. To accept this position is to ignore the record before us.

■■■ Although its origin is and will no doubt remain unknown, an error was committed as to the amount of land owned by the Kakris family. Although it now seems clear that after the transfers made in 1963, 1964, and 1968, the Kakrises still owned a twenty-acre parcel of land, the town lost track of the property and the Kakris name was dropped from the tax rolls. Once this mistake was made, the town had absolutely no reason to doubt or check the accuracy of its records. From this point forward, the Kakris family was in a superior position to discover and rectify the error. They had ample opportunity to recognize the inaccuracy and to notify the town. Keeping the applicable standard of review in mind, we note the master's evaluation of the situation:

"adequate opportunity existed, both during the lifetime of Mr. Christos Kakris and prior to the 1983 tax sale[,] for the Kakris family . . . to investigate and determine whether any property remained after the Berrys' and Seamans' transfers . . . . [T]he disappearance of the Kakris' property from the tax rolls occurred as early as 1965. Mr. Kakris himself, although ill, certainly should have realized that he was not receiving a tax bill and had the opportunity to look into the matter and find out why. Furthermore, in 1968 when the Kakris' property reappeared on the tax rolls as being only the 2 acre parcel, the Kakrises had notice as to the town's then present position with regard to what they owned and what was subject to tax and had full opportunity to review the records of the town as well as the conveyancing sequence."

There is sufficient evidence in the record to support the master's findings, much of it having been discussed above. We will not disturb his decision.

Without addressing the issue of whether or not the Kakrises had a duty to keep the town informed as to their land holdings, we note that had they filed inventories, paid taxes, made inquiry, or acted in any way consistent with ownership of the property, this would have been taken into consideration when evaluating the reasonableness of the efforts made by the town to locate the record owner of this twenty-acre parcel.

Finally, we note that, to the extent relied upon by the parties, our recent decision in the case of *White v. Wolfeboro*, 131 N.H. 1, 551 A.2d 514, (1988), has no bearing on the case currently before us. That decision is to be applied prospectively "from the date of that opinion forward to the effective date of any amending legislation." *Opinion of the Justices*, 131 N.H. 644, 649, 557 A.2d 1364, 1368 (1989). It clearly is not relevant here, where our inquiry focuses on a tax sale conducted in 1983.

Accordingly, the decision of the trial court is

*Affirmed.*

SOUTER, J., did not participate in the decision; the others concurred.