NOTICE:  This opinion is subject to motions for rehearing under Rule 22 as well as formal revision before publication in the New Hampshire Reports. Readers are requested to notify the Reporter, Supreme Court of New Hampshire, One Charles Doe Drive, Concord, New Hampshire 03301, of any editorial errors in order that corrections may be made before the opinion goes to press.  Errors may be reported by E-mail at the following address: reporter@courts.state.nh.us.  Opinions are available on the Internet by 9:00 a.m. on the morning of their release. The direct address of the court's home page is: http://www.courts.state.nh.us/supreme.

THE SUPREME COURT OF NEW HAMPSHIRE

———————————————

Rockingham
No. 2016-0258


INTERNATIONAL BUSINESS MACHINES CORPORATION

v.

GARY JOSEPH KHOURY

Argued:  March 30, 2017
Opinion Issued:  December 21, 2017


Jackson Lewis P.C., of Portsmouth (Martha Van Oot on the brief and orally), for the appellant.


Honig & Barnes LLP, of Haverhill, Massachusetts (Robyn Frye Honig and Timothy H. Barnes on the brief, and Ms. Honig orally), for the appellee.


DALIANIS, C.J.  The appellant, International Business Machines Corporation (IBM), appeals an order of the Superior Court (Schulman, J.) upholding a wage claim decision issued by the New Hampshire Department of Labor (DOL) in favor of the appellee, Gary Joseph Khoury.  We affirm.

Before addressing the merits of this appeal, we note that we are dismayed by the tone of the dissent.  The dissent impugns our motives, stating that we have have "rewrit[ten] the contract to strike a better deal" for Khoury "than he made for himself" because of our "paternalistic instinct," which, the

dissent states, "contravenes the proper bounds of judicial authority." It is unfortunate that our dissenting colleague views our contract interpretation as result-oriented merely because he disagrees with it.

I

The following facts were found by the DOL hearing officer, are established in the record, or are otherwise not in dispute. In January 2013, Khoury began working for IBM as a sales representative in the federal business unit, and remains a current employee of IBM. Khoury earns both a base salary and commissions.

As part of his work, Khoury sells IBM's products to the federal government. At the DOL hearing, Khoury explained that IBM occasionally sells software to a certain "business partner," who, in turn, has the "rights, so to speak, to the sales that the sales teams were transacting with the" federal government. He further explained that IBM does not profit from the distribution of its products to the government by this business partner, but IBM assists in the subsequent deployment process.

Khoury testified that, prior to July 2014, IBM paid its sales representatives commissions based solely upon revenue-generating sales. According to Khoury, under this arrangement, sales representatives lacked an incentive to promote the deployment of IBM products that had previously been sold to the intermediary business partner, and a number of sales representatives had quit and found other jobs within IBM. In July 2014, IBM rolled out a new pilot program that allowed sales representatives to earn commissions on both the sale and deployment of IBM's products. Under this program, sales representatives would receive a "primary" commission for reaching a revenue or sales quota and a "secondary" commission for reaching a deployment quota. Khoury testified that, approximately every six months, IBM sent each sales representative an individualized Incentive Plan Letter (IPL) defining the method by which the sales representative's commissions would be calculated for sales and new deployments.

In mid-July 2014, IBM presented Khoury with an IPL for the period of July 1, 2014, to December 31, 2014. Pursuant to the terms of the IPL, Khoury would receive the "secondary" commission at issue in this case after meeting a quota of $571,000 for certain specified signings. The IPL contained several prominent disclaimers, however:

> **Right to Modify or Cancel:** The [IPL] does not constitute an express or implied contract or a promise by IBM to make any distributions under it. IBM reserves the right to adjust the [IPL] terms, including, but not limited to, changes to sales performance objectives (including

management-assessment objectives), changes to assigned customers, territories, or account opportunities, or changes to applicable incentive payment rates or quotas, target incentives or similar earnings opportunities, or to modify or cancel the [IPL], for any individual or group of individuals, at any time during the [IPL] period up until any related payments have been earned under the [IPL] terms. . . . Employees should make no assumptions about the impact potential [IPL] changes may have on their personal situations unless and until any such changes are formally announced by IBM.

**Adjustment for Errors:** IBM reserves the right to review and, in its sole discretion, adjust or require repayment of incorrect incentive payments resulting from incomplete incentives processes or other errors in the measurement of achievement or the calculation of payments, including errors in the creation or communication of sales objectives. Depending on when an error is identified, corrections may be made before or after the last day of the full-[IPL] period, and before or after the affected payment has been released.

 . . . .

**Plan-to-Date Advance Payments:** Regardless of the start date of your assignment to [an IPL], the full-[IPL] period ends on the last day of the last month of the full-[IPL] period. Incentive payments you may receive for [IPL]-to-Date achievement (before the full-[IPL] period is over and before its business results are complete) are a form of advance payment based on incomplete business results. As each month's or quarter's business results become available, [IPL]-to-Date achievement against any full-[IPL] performance objectives will be updated and the amount of your [IPL]-to-Date advance payments will be recalculated. Deductions for overpayments or reversed achievement may be made from any such [IPL]-to-Date advance payments until the full-[IPL] payments are earned under the [IPL] terms after the full-[IPL] period and its business results are complete.

**Full-Plan Earnings:** Regardless of your start date, your incentive payments are earned under the [IPL] terms, and are no longer considered [IPL]-to-Date advance payments, only after the measurement of complete business results following the end of the full-[IPL] period or (if applicable) after the measurement of complete business results after the date you left the Incentive Plan early. Incentive payments will be considered earned only if you have met all payment requirements, including: (1) you have

3

complied with the [IPL], the Business Conduct Guidelines and all other applicable IBM employment policies and practices; (2) you have not engaged in any fraud, misrepresentation or other inappropriate conduct relating to any of your business transactions or incentives; (3) and the customer has paid the billing for the sales or services transaction related to your incentive achievement.

. . . .

**Significant Transactions:** IBM reserves the right to review and, in its sole discretion, adjust incentive achievement and/or related payments associated with a transaction which (1) is disproportionate when compared with the territory opportunity anticipated during account planning and used for the setting of any sales objectives; or for which (2) the incentive payments are disproportionate when compared with your performance contribution towards the transaction.

The IPL also stated that IBM was "not obligated to offer . . . an alternative [IPL] . . . [or] another job role within the company" to any sales representative who did not accept the IPL terms.

Khoury acknowledged the terms of the IPL and accepted it on July 16, 2014. By the end of the IPL period, he had met and surpassed his quota for the specified signings. At the DOL hearing, he testified that, in December 2014, his manager informed him that this entitled him to a commission payment of $154,124.21. That same month, he received $47,619.23 in advances from IBM towards this commission. Khoury testified that he subsequently made repeated unsuccessful inquiries about the additional funds.

In March 2015, Khoury filed a wage claim with the DOL for $106,504.65, the balance of the commission. One month later, Khoury was informed that IBM planned to change his IPL terms by increasing the original quota from $571,000 to $1,000,000. Khoury testified that he was told that he could expect to receive a final payment of approximately $35,000 to $36,000. He stated that he then received a payment of $34,558.71 in May. Upon receiving this payment, Khoury reduced his wage claim against IBM from $106,504.65 to $71,946.27.

Khoury testified that participation in the pilot program was mandatory, and that sales representatives "ha[d] to accept the terms of [the IPL], or [they] ha[d] to either change [their] position within the company or find a new place to work." He also stated that IBM did not begin to describe the pilot program as

4

"a pilot program" until "later in 2014 and into 2015" and that, before that, it was considered "the program you're going to sell under." Khoury explained that his understanding, after reading the IPL, was "that all of the work that I did during the [IPL] term . . . and all of the commissions that I earned would be paid during the term[] of this [IPL]."

Khoury testified that, although IBM had recognized him as a "Global Sales Hero" for his sales achievements in the third quarter of 2014, it delayed paying him the commissions he was owed. According to Khoury:

> [I]n early November 2014, we were on a conference call in which we were told not that anyone was being capped, not that commissions were changing, or anything else, that it was a new pay system, and therefore it was taking a little bit longer.
>
> . . . They were trying to get our commissions to [route] through this new system, and there was going to be a check paid to us in full at the end of November 2014. That didn't happen.
>
> . . . [E]verything that was spoken to us was around this common lie that it was just a matter of time, that the system was broken, you gentlemen did a wonderful job, you're going to get your money, and it's -- just wait a little bit longer. Trust us and wait.

Khoury stated that it was not until May 2015 that he was informed by "IBM federal leadership" that his sales quota would be adjusted upward, thereby reducing his commission.

Susan Deyo, IBM's Vice President of Sales Strategy and Transformation for North America, testified that IBM started getting "customer reports" in October 2014 that showed that the majority of IBM sales representatives in the pilot program had already made their quota amount. She stated that, in January 2015, "more reports" came in, and that by January 15, 2015, they had the results of the plan period; it was around that time that she and several other IBM executives began to discuss "what [they] were going to do on adjusting the quotas because [they] had determined the quotas were set incorrectly." She testified that these discussions were started again in February and led to an assessment in March. She stated that employees in the pilot program were notified in April that there would be a change, but not what the change was, or when it took effect.

Following the hearing, the DOL hearing officer concluded that IBM violated RSA 275:49 (Supp. 2016) and New Hampshire Administrative Rules, Lab 803.03(c) (Lab 803.03(c)) because IBM had changed the amount of Khoury's quota from $571,000 to $1,000,000 and had failed to notify him of

the change "prior to the change becoming effective." The relevant provisions of RSA 275:49 provide that "[e]very employer shall . . . [n]otify the employees, at the time of hiring of the rate of pay, and of the day and place of payment," RSA 275:49, I, and "[n]otify his or her employees of any changes in the arrangements specified [in paragraph I] prior to the time of such changes," RSA 275:49, II. Lab 803.03(c) states that "every employer shall inform his or her employees in writing of any change to such employees['] rate of pay, salary, or employment practices or policies . . . prior to the effective date of such change." N.H. Admin. R., Lab 803.03(c). The hearing officer found unpersuasive IBM's "argument that Courts have consistently upheld the right to modify, change or cancel terms of a commission policy, providing there is notice in the policy itself." Thus, the hearing officer determined Khoury was owed the full amount of his wage claim. The hearing officer did not address the issue of whether the IPL constituted a contract.

IBM appealed to the trial court. See RSA 275:51, V (2010). In November 2015, the trial court held a non-evidentiary hearing based upon the record established at the DOL. See id. The court concluded "that the IPL established a default commission scheme that would automatically ripen into a contractual right to commissions calculated under that scheme, unless the incentive plan was altered or eliminated prior to the measurement of business results. IBM changed Khoury's incentive plan after this deadline and communicated this fact to him in writing after the change became effective." (Emphasis omitted.)

The court reasoned:

The IPL purports not to be a contract. However, IBM committed itself to pay all incentives that have actually been "earned." These two statements, contained in the same paragraph, are oxymoronic. The only way to round the circle is to construe the paragraph as giving the employee no contractual rights up until the moment the incentive payments have been earned.

The court determined that Khoury had "earned" his incentive payments on January 15, 2015, the date when IBM had available to it the business results for the IPL period ending on December 31, 2014. The court acknowledged that the IPL provided that incentive payments are "earned" "only after the measurement of complete business results following the end of the full-Plan period," but concluded that the plain and ordinary meaning of "measurement" as used in the IPL is "ministerial bean counting and the application of accounting principles rather than discretionary or strategic planning." The court further concluded that the provision of the IPL dealing with "Adjustments for Errors" was "a safety valve for ministerial mistakes in measurement, calculation and communication," and that "[t]he ability to 'correct errors' does not entitle IBM to rethink its commission scheme after commissions have been

6

fully earned." Thus, the court concluded that "[a] reasonable employee would view the document as a whole as establishing a default commission formula, albeit one that could be changed prior to the measurement of business results." Having ruled that IBM changed Khoury's incentive plan after the measurement of business results, the court affirmed the DOL's decision. In addition, the trial court awarded Khoury attorney's fees and statutory interest pursuant to RSA 275:53 (2010) and RSA 524:1-b (2007), respectively. Khoury's request for an award of liquidated damages pursuant to RSA 275:44 (2010) was denied. This appeal followed.

## II

On appeal, IBM argues that the trial court erred by finding Khoury's wage claim valid, asserting that: (1) IBM had no obligation to pay commissions to Khoury in any set amount, including on the basis of the original quota, because the IPL was not an enforceable agreement; and (2) RSA 275:49 and Lab 803.03(c) do not apply to the IPL presented to Khoury because the IPL, which is not an enforceable agreement, does not establish "wages" or a "rate of pay" under the terms of those laws. See RSA 275:49; N.H. Admin. R., Lab 803.03(c). IBM alternatively argues that, even if the IPL is an enforceable contract, IBM did not violate its obligations to Khoury because the IPL's terms granted IBM an "unfettered right to reduce [Khoury's] commissions and adjust his quota" after the measurement of business results for 2014. Finally, IBM asserts that the trial court erred by awarding Khoury attorney's fees and statutory interest.

Any party aggrieved by a DOL wage claim decision may appeal to the trial court by petition, setting forth that the decision is erroneous, in whole or in part, and specifying the grounds upon which the decision is claimed to be in error. See RSA 275:51, V. "The scope of review by the superior court shall be limited to questions of law." Id. "After hearing and upon consideration of the record, the court may affirm, vacate or modify in whole or in part the decision of the commissioner, or may remand the matter to the commissioner for further findings." Id. "We, in turn, review de novo the trial court's decisions on questions of law." Ichiban Japanese Steakhouse v. Rocheleau, 167 N.H. 138, 140 (2014).

## A

IBM first asserts that the trial court erred by determining that the IPL was an enforceable contract that imposed an obligation upon IBM to pay Khoury his secondary commission as calculated under the original IPL formula. IBM argues that the lengthy disclaimers in the IPL, especially the language that the IPL "does not constitute an express or implied contract or a promise by IBM to make any distributions under it," prevent the IPL from being

construed as a contractual offer, and, consequently, an enforceable agreement or contract. Khoury, however, argues that the IPL constituted an agreement that obligated IBM to pay him the full amount of the secondary commission. Thus, we read the parties' arguments as focusing upon whether the IPL is an enforceable contract.

"Offer, acceptance and consideration are essential to contract formation." Chisholm v. Ultima Nashua Indus. Corp., 150 N.H. 141, 144 (2003). "An offer is the manifestation of willingness to enter into a bargain," Restatement (Second) of Contracts § 24, at 71 (1981), while an agreement "is a manifestation of mutual assent on the part of two or more persons," id. § 3, at 13. "A valid offer may propose the exchange of a promise for a performance." Chisholm, 150 N.H. at 144 (quotation and ellipsis omitted). "Consideration is present if there is either a benefit to the promisor or a detriment to the promisee." Id. at 145. Finally, a contract requires a meeting of the minds about the contract's terms: "each party must have the same understanding as to the terms of the agreement." Simonds v. City of Manchester, 141 N.H. 742, 744 (1997) (quotation omitted).

"In determining the actual understanding and intent of the parties, the trier of fact should consider the objective meaning of the expressed contract terms." Tsiatsios v. Tsiatsios, 140 N.H. 173, 178 (1995). "The intent of the parties is determined by an objective standard, and not by actual mental assent." Id. (quotation omitted). "An objective standard places a reasonable person in the position of the parties, and interprets [contractual terms] according to what a reasonable person would expect [them] to mean under the circumstances." Behrens v. S.P. Constr. Co., 153 N.H. 498, 502 (2006). "[U]ndisclosed meanings and intentions are immaterial in arriving at the existence of a contract between the parties." Simonds, 141 N.H. at 744 (quotation omitted).

Viewed objectively, the language in the IPL is contradictory. On the one hand, the IPL states that it "does not constitute an express or implied contract or a promise by IBM to make any distributions." However, the IPL also states that IBM "reserves the right to adjust the [IPL] terms, . . . or to modify or cancel the [IPL] . . . at any time during the [IPL] period up until any related payments have been earned under the [IPL] terms," implying that IBM loses its right to modify or cancel the IPL after the payments have been "earned," and that it then becomes obligated to pay the employee. (Emphasis added.) Similarly, the IPL states that payments are "earned under the [IPL] terms, and are no longer considered [IPL]-to-Date advance payments, only after the measurement of complete business results following the end of the full-[IPL] period." This term also limits IBM's right to cancel the agreement: it cannot do so once complete business results have been measured. Thus, the IPL purports not to be a contract, yet simultaneously limits IBM's ability to cancel the agreement and

8

imposes upon IBM an obligation to pay the employee after commission payments have been earned.

Although we have previously held that unambiguous disclaimers are effective in rendering certain portions of employment documents unenforceable, see Butler v. Walker Power, 137 N.H. 432, 436-37 (1993), we have not addressed a situation in which a disclaimer is contradicted by language that evinces an intent by the employer to be bound under certain conditions. At least one other court has ruled that, when a disclaimer in an employment document is "rationally at odds" with other language in the document, an employer may be bound to the terms of the document despite the presence of the disclaimer. See Strass v. Kaiser Foundation Health Plan, 744 A.2d 1000, 1013 (D.C. 2000).

Here, we conclude that a reasonable person in the position of the parties would construe the IPL as presenting Khoury with a limited contractual offer; namely, that if he performed satisfactorily under the terms imposed in the IPL, and if IBM did not adjust the quotas or the terms of the IPL prior to the time that his commissions were "earned" as that term is defined in the IPL, IBM then became obligated to make the commission payments to him as originally calculated. See 11 Richard A. Lord, Williston on Contracts § 32.5, at 692-99 (4th ed. 2012) ("A contract will be read as a whole and every part will be read with reference to the whole. If possible, the contract will be so interpreted as to give effect to its general purpose as revealed within its four corners or in its entirety." (footnotes omitted)). Khoury accepted IBM's offer on July 16, 2014, and thereafter furnished consideration by performing under the IPL and meeting his quota.

Furthermore, the language of the IPL suggests that there was, in fact, a "meeting of the minds." Viewing the IPL terms objectively, a reasonable person would view the document as establishing a default scheme for the calculation of commission payments, albeit one that could be adjusted by IBM up until those payments had been earned. As the trial court aptly observed in rejecting IBM's position that the IPL was not designed to establish a default commission formula:

> Why else include a specific formula? Why else require employees to "accept" the formula? Why else reserve the right to make changes up until the time commissions are "earned"? Why say that commissions are earned upon "measurement" of business results? Why include a severability clause in case one or more disclaimers conflicts with state law? Why include terms and conditions if there is no underlying deal to which they apply?

We conclude that a reasonable person viewing the language of the IPL would reconcile the contradictory language by construing it to grant Khoury contractual rights to his commission once business results for that IPL period were measured.  See id.  Thus, there was a valid offer, acceptance, consideration, and, objectively viewing the IPL, a meeting of the minds.  See Chisholm, 150 N.H. at 145; Simonds, 141 N.H. at 744.

We acknowledge, as did the trial court, that a number of federal courts have held that various iterations of IBM's IPLs did not constitute enforceable contracts under the circumstances presented in those cases.  See Kavitz v. International Business Machines, 458 F. App'x 18, 20 (2d Cir. 2012); Geras v. International Business Machines Corp., 638 F.3d 1311, 1316-17 (10th Cir. 2011); Jensen v. International Business Machines, 454 F.3d 382, 388 (4th Cir. 2006); Schwarzkopf v. Int'l Bus. Machs., Inc., No. C 08-2715 JF (HRL), 2010 WL 1929625, at *8-9 (N.D. Cal. May 12, 2010); Gilmour v. Int'l Bus. Machs. Corp., No. CV 09-04155 SJO (AGRx), 2009 WL 871253, at *2 (C.D. Cal. Dec. 16, 2009); Rudolph v. Int'l Bus. Machs. Corp., No. 09 C 428, 2009 WL 2632195, at *4 (N.D. Ill. Aug. 21, 2009).  However, those cases do not control our interpretation of the IPL in this case under New Hampshire contract law, and they are factually distinguishable.

In Kavitz, the plaintiff challenged IBM's calculation of his commission for a transaction involving a single customer.  Kavitz, 458 F. App'x at 19.  The court's opinion does not reveal whether IBM recalculated the commission before or after it had been "earned" under the plan.  Indeed, as the trial court noted, the opinion does not even indicate when commissions would be "earned" under the plan.  Without that information, Kavitz provides us with little guidance.

Moreover, Kavitz relies upon Geras and Jensen, stating that it finds persuasive the relevant analysis in those decisions.  Id. at 20.  In Geras, however, the court considered changes made to the plaintiff's incentive plan prior to the payments having been "earned."  Geras, 638 F.3d at 1316 n.1.  The court specifically noted that the case "does not raise the question of whether an employee might succeed on a contract or promissory estoppel case against IBM for payments that were not refused until after they had been deemed earned under the plan's terms."  Id.  Thus, Geras provides no guidance with respect to the issue before us, which, as discussed below, involves adjustments to incentive payments made by IBM after the payments were "earned" under the plan's terms.

In Jensen, the plan provided that IBM reserved the right to adjust the program terms or to cancel or otherwise modify the program "at any time during the program period, or up until actual payment has been made under the program," and further provided that "no one becomes entitled to any

10

payment in advance of his or her receipt of the payment." Jensen, 454 F.3d at 385 (quotations omitted). Thus, Jensen also provides no guidance with respect to the issue before us.

Similarly, Rudolph involved an incentive plan that allowed IBM to modify or cancel it "at any time for any reason — on a prospective or retroactive basis." Rudolph, 2009 WL 2632195, at *1. Nothing in the opinion indicates whether the plan stated when commissions would be "earned," and, in any event, the plan was terminated by IBM during the plan term. Id.

Schwarzkopf involved a modification by IBM of a "significant transaction." Similarly to the plan before us, the plan in Schwarzkopf contained a "Significant Transactions" provision that permitted IBM to adjust: (1) incentive payments associated with transactions that were disproportionate when compared with the territory opportunity or quota size; and (2) incentive payments that were disproportionate when compared with the employee's performance contribution towards the transactions. Schwarzkopf, 2010 WL 1929625, at *2. The plan also contained, similarly to the plan before us, a "Right to Modify or Cancel" provision that permitted IBM to adjust the plan terms or cancel the plan "at any time during the Plan period up until any related payments have been earned under its terms." Id. at *1. The court stated that the "Significant Transactions" clause appeared to allow IBM to adjust disproportionate incentive payments at any point, but that the more restrictive language in the "Right to Modify or Cancel" provision "may prevent IBM from modifying the terms of the incentive plan once a salesperson 'earns' [a] commission." Id. at *9. Thus, Schwarzkopf, like Geras, provides no guidance for deciding this case, where IBM adjusted Khoury's commission after it had been "earned," and where the commission was not adjusted under the "Significant Transactions" provision.

Finally, in Gilmour, the court relied upon IBM's offer letter, which stated that IBM reserved the right to modify or cancel the incentive plan "at any time." Gilmour, 2009 WL 8712153, at *1 (quotation omitted). Although the court also noted that the employee had received a "quota letter" that provided that IBM could adjust or cancel the plan "up until any related payments have been earned under its terms," the court's opinion does not discuss or reveal whether or how payments were to be "earned" under the terms of the IPL. Id. (quotation omitted). If the payments had not been earned when IBM changed the plan, then the case is not on point with the instant case. If the payments had been earned, then in light of the court's failure to consider that fact in its analysis, we find its analysis to be unpersuasive.

We conclude that the specific terms of the IPL constituted an enforceable contract, which granted Khoury rights to a commission once it had been earned pursuant to the IPL terms. See Demers Agency v. Widney, 155 N.H.

658, 662 (2007) (affirming trial court's determination that an employee's bonus qualified as wages for purposes of RSA chapter 275, but limiting holding to "those circumstances in which a bonus is part of an agreed-upon compensation package and the employee has performed all of the duties necessary to trigger the employer's obligation to pay the bonus"); cf. Geras, 638 F.3d at 1316 n.1 (noting that the case did not raise the question of whether the plaintiff might succeed against IBM "for payments that were not refused until after they had been deemed earned under the plan's terms").

We, therefore, conclude that the IPL is a contract — one that granted Khoury rights to his commission once it had been earned pursuant to IBM's measurement of complete business results for the IPL period. Accordingly, we affirm the trial court's ruling that the IPL constituted a contract.

B

Having established that the IPL is an enforceable contract, we next turn to the question of whether IBM acted in accordance with its terms.

IBM asserts that, even if an enforceable contract existed, it did not breach the terms of the IPL because the decision to change the commission quotas was made before Khoury's commission payments were "earned." In IBM's view, Khoury's payments were not "earned" until "after the measurement of complete business results following the end of the Full-[IPL] period," a phrase which IBM interprets to grant it the right to make adjustments of commission quotas "after it assessed the impact of its complete business results." (Quotation omitted.)

Khoury counters that IBM violated the terms of the IPL because the measurement of business results was completed by January 15, 2015. In particular, he asserts that neither the "measurement of complete business results" provision nor the "Adjustment for Errors" provision of the IPL provides support for IBM's position because, as the trial court concluded, these provisions merely allow for the correction of ministerial mistakes, such as misplacing a decimal point, but do not allow for IBM to rethink its commission scheme after commissions have been earned. Thus, Khoury argues that IBM's retroactive adjustment of his commission quotas was a violation of the IPL terms.

On this point, we agree with the trial court. The IPL authorizes IBM to make "changes to applicable incentive payment rates or quotas, target incentives or similar earnings opportunities, or to modify or cancel the [IPL] . . . at any time during the [IPL] period up until any related payments have been earned under the [IPL] terms." The IPL also states that incentive payments are "earned under the [IPL] terms . . . only after the measurement of complete

12

business results following the end of the full-[IPL] period." Thus, the plain language of the IPL supports the trial court's conclusion that "IBM's ability to change or eliminate the incentive program ends once the measurement process is complete." Here, the record supports the trial court's conclusion that complete business results were available by January 15, 2015. Neither party on appeal challenges the trial court's statement that "the record does not suggest that IBM experienced any difficulty or delay in measuring any business results for the IPL term." Thus, Khoury's incentive payments were "earned" before IBM concluded in March that the quotas should be changed.

IBM argues that the trial court's reading of the IPL "negates" its right to adjust the plan's terms. It contends that the IPL must be read to provide it with an unspecified period of time following January 15, 2015, in which to assess the impact of the business results and consider whether to modify or eliminate the plan. We are not persuaded. The IPL provides that incentive payments are "earned" after the "measurement" of complete business results. "Measurement" is defined as "the act or process of measuring something." Webster's Third New International Dictionary 1400 (unabridged ed. 2002). The relevant definition of "measure" is "to ascertain the quantity, mass, extent, or degree of in terms of a standard unit or fixed amount." Id. Had IBM intended that incentive payments not be "earned" until some period of time had passed following the measurement of complete business results in order for IBM to undertake some process of review or evaluation of the incentive program quotas in light of those results, then it should have clearly so provided in the IPL.

We note that "measure" is also defined as "to judge or estimate the extent, strength, worth, or character of (as a quality, action, or person)." Id. However, reading the contract as a whole, we believe that the word "measurement," when applied to "business results," refers to the ascertainment of the quantity and extent of the results — or, as the trial court put it, "ministerial bean counting and the application of accounting principles rather than discretionary or strategic planning." Moreover, as explained below, our construction of the term also furthers the purpose of the applicable statute and regulations.

This reading of the IPL does not negate IBM's asserted right to modify or cancel the IPL. Assuming that IBM had the unilateral right to modify or cancel the plan, it was free to do so at any time during the plan period and up until the measurement of complete business results following the end of the plan period. However, once that measurement was completed — here January 15 — IBM's right to modify or cancel the plan ended. We note that the trial court also ruled that IBM retained the right to adjust for errors even after the measurement of complete business results had occurred, a ruling that is not challenged on appeal. The adjustment for errors provision of the IPL states

13

that

> IBM reserves the right to review and, in its sole discretion, adjust or require repayment of incorrect incentive payments resulting from incomplete incentives processes or other errors in the measurement of achievement or the calculation of payments, including errors in the creation or communication of sales objectives. Depending on when an error is identified, corrections may be made before or after the last day of the full-[IPL] period, and before or after the affected payment has been released.

This provision provides IBM with a limited right to correct errors in the "measurement of achievement or the calculation of payments," including any such errors that may have occurred in the creation or communication of sales objectives. Cf. Home Gas Corp. v. Strafford Fuels, Inc., 130 N.H. 74, 82 (1987) (broader term takes on the more specialized character of its neighbors). We agree with the trial court that this provision would permit IBM to correct, at most, ministerial mistakes in measurement, calculation, and communication after commissions have been earned.

We further note that, unlike the provision of the IPL that governs IBM's ability to modify or cancel the program, the provision permitting adjustment for errors does not provide that such adjustments must be made before payments have been earned under the plan terms. Moreover, permitting adjustments based upon ministerial errors in the measurement of achievement or the calculation of payments after business results have been measured would not undermine the underlying agreement to pay "earned" commissions — the correction of such errors merely conforms the result to the actual amount that the parties intended be "earned."

Here, there is no allegation that IBM made any "errors in the measurement of achievement or the calculation of payments" when it created or communicated its sales objectives to Khoury. This is not a case, as the trial court explained, in which IBM "misplaced a decimal point" in its creation or communication of sales objectives. Rather, as the trial court aptly stated, "IBM delayed paying Khoury solely because it wished to conduct an after-the-fact reevaluation of what the commission quota should be."

Our construction of the IPL also furthers the purpose of the applicable statute and regulations. Cf. Galloway v. Chicago-Soft, 142 N.H. 752, 759 (1998) (we construe RSA chapter 275 in general to effectuate the broad purpose of protecting employees). RSA 275:49 requires employers to notify all employees at the time of hiring of the rate of pay, as well as of any changes to the rate of pay prior to the time of such changes. "Rate of pay" includes the manner in which commissions are calculated and paid. See N.H. Admin. R.,

Lab 803.3(a) (employer shall notify employees as to the rate of pay, whether by daily, weekly, biweekly, semi-monthly, or yearly, or by commissions, "as well as the day and place of payment and the specific methods used to determine wages due"). In addition, Lab 803.3 requires that the notification to employees of their rate of pay be in writing. One obvious purpose of these provisions is to ensure that employees understand what their rate of pay will be as well as any changes that are to be made thereto. Accordingly, it is incumbent upon employers to clearly set forth the information required by Lab 803.3 in any notice provided to employees, keeping in mind that the notice required by the rules is generally intended for non-lawyer employees.

Similar considerations led us to adopt the rule that ambiguous terms in insurance policies will be construed against the insurer. In Trombly v. Blue Cross/Blue Shield, 120 N.H. 764 (1980), we explained that an argument in favor of that rule of construction "is that, since the object of the contract is to provide protection for the insured, the construction that best achieves this purpose should be adopted." Trombly, 120 N.H. at 771. Here, the evident purpose of RSA 275:49 and Lab 803.3 is to ensure that employees understand their rate of pay and any changes thereto, including the manner in which commissions are calculated and paid. Construing any ambiguity in those portions of the IPL that provide such notice in favor of the employee would further that purpose. Thus, even were we to agree that the term "measurement of complete business results" is ambiguous, we would reach the same result in this case.

Here, IBM set forth a rate of pay that applies once payments are earned, and stated that payments are earned "after the measurement of complete business results following the end of the full-[IPL] period." A reasonable employee would understand this language to mean what it says — after complete business results are measured following the end of the full-IPL period, his or her payments have been "earned." IBM, on the other hand, would have us require employees to speculate as to why IBM chose that particular time to be the time when payments are earned, and surmise that what IBM really meant to say was that payments are not earned until weeks or months after the measurement of complete business results, such that IBM could decide to change the plan in March, as it attempted to do here, despite the fact that complete business results had been available by January 15. We decline to construe the IPL in such a manner.

We find further support for our holding in Galloway. There we noted that as a general rule, a person employed on a commission basis is entitled to a commission when the order is accepted by the employer. Galloway, 142 N.H. at 756. We held that this general rule could be altered by a written agreement by the parties or by conduct of the parties that "clearly demonstrates a different compensation scheme." Id. at 757 (emphasis added). Our holding

reflects the policy discussed above — when an employer provides notice to an employee of the rate of pay, it must be <u>clearly</u> set forth. Here, while we agree that the IPL clearly notified Khoury that his incentive payments would not be earned until after the measurement of complete business results, that language "clearly" informed him only that his payments would not be earned prior to the measurement of complete business results. Nothing in the IPL "clearly" informed Khoury that his payments would not be earned until months after complete business results were measured, when IBM concluded its reevaluation of the plan and redetermined what the quotas should be.

We acknowledge that the Eleventh Circuit Court of Appeals characterized a "Right to Modify or Cancel" clause, which was similar to the clause at issue in this case, as providing that commissions "are not earned until business results are complete—i.e., until IBM assesses the impact of a significant transaction on an employee's sales quota." <u>Wilson v. Int'l Bus. Machs. Corp.</u>, 610 F. App'x 886, 889 (11th Cir. 2015) (per curiam). The issue being addressed in that case was whether IBM's right to modify ended on June 30, 2011, which was the last day of the applicable sales period. <u>Id</u>. We do not dispute that the "Right to Modify or Cancel" clause purports to allow IBM to modify or cancel the plan after the plan period ended — that is, after December 31, 2014. To the extent that <u>Wilson</u> may be read as providing IBM with an unspecified period of time after the measurement of complete business results within which to modify or cancel the plan, however, we are not persuaded for the reasons set forth above.

We note that the dissent finds support for its view in <u>Walsh v. Zurich American Insurance Company</u>, 853 F.3d 1 (1st Cir. 2017). The incentive plan there at issue provided that "INCENTIVE under the PLAN shall be <u>solely within the discretion</u> of the Executive Vice President of the [employer] and is subject to interpretation by him/her. The PLAN is <u>subject to cancellation by the Executive Vice President at any time</u>." <u>Id</u>. at 5 (emphases added). Further, the employer explicitly "reserve[d] the right to limit INCENTIVE in unique situations." <u>Id</u>. The First Circuit concluded that the Plan did not give the employee "a vested deferred compensation entitlement," noting that the Plan gave the employer broad discretion to limit incentive pay. <u>See id</u>. at 11, 13-15. The dissent contends that this case is similar because Khoury "was informed . . . that payments were not 'earned' until 'after the measurement of complete business results following the end of the full-[IPL] period,' <u>which would not occur until IBM had completed its review of the entire IPL period and corrected any errors that may have occurred in, among other things, the creation or setting of his quota</u>." (Emphasis added.) We have no quarrel with the holding in <u>Walsh</u>. Rather, our disagreement with our dissenting colleague lies simply in the construction of the IPL, which is very different from the plan language in <u>Walsh</u>. Had the IPL clearly provided that payments would not be "earned" until after (1) the measurement of complete business results, and (2) in the words of the dissent, "IBM had completed its review of the entire IPL period," then we

16

would be looking at a different case. However, as we explained above, we are not persuaded that the phrase "after the measurement of complete business results following the end of the Full-[IPL] period" clearly informed Khoury that his incentive payments would be earned only after measurement of complete business results and the completion of IBM's retrospective assessment of its quotas — a process which was not time-limited. Thus, we find Walsh of little assistance in resolving the contract interpretation issue before us.

Finally, we further note that the dissent imagines a parade of horribles flowing from our decision in this case. We, like the Supreme Court, "do not in principle oppose the 'parade of horribles' form of argumentation, but its strength is in direct proportion to . . . the probability that the parade will in fact materialize." Harmelin v. Michigan, 501 U.S. 957, 986 n.11 (1991) (citing Scalia, Assorted Canards of Contemporary Legal Analysis, 40 Case W. Res. L. Rev. 581, 590-93 (1989-1990)). The dissent hypothesizes that our interpretation of the IPL will "make it all but impossible for IBM to utilize contracts that give it the option to adjust incentive quotas based on a retrospective analysis of results," speculating that "a large company like IBM will simply decide to relocate its sales force" to other states. Happily, the much more likely consequence is that a company like IBM, should it wish to have the option to adjust or eliminate incentive quotas based on a retrospective analysis of results, will simply hire a skilled attorney who will prepare a contract that will clearly so provide. This is not difficult, in fact, as IBM has drafted incentive contracts with its sales force that do just that. See, e.g., Jensen, 454 F.3d at 385 (IBM plan reserved right to adjust program terms or cancel or modify program "at any time during the program period, or up until actual payment has been made," and provided that "no one becomes entitled to any payment in advance of his or her receipt of the payment" (emphases added)). Indeed, had Khoury's contract clearly provided that payments would not be "earned" until "IBM had completed its review of the entire IPL period" — which could occur many months after the measurement of complete business results — we would be looking at a different case. Thus, while the "parade of horribles" imagined by the dissent may be alarming, the unlikelihood of the parade actually materializing robs it of any persuasive power. Rather, the more likely consequence of our decision today will be a parade of clearly written employment agreements which will benefit employers and employees alike.

Because we conclude that the claimed wages were earned under the terms of the IPL, we affirm the trial court's order requiring IBM to pay Khoury the full amount of his wage claim, less applicable taxes. Therefore, we need not decide whether IBM violated RSA 275:49 and Lab 803.03(c).

IBM next challenges the trial court's award of statutory interest and attorney's fees.  The challenge to the award of interest is premised upon the contention that IBM does not owe any wages, which we have rejected above.  Accordingly, we affirm the award of statutory interest.

The challenge to the award of fees is limited to the award of fees for the proceedings before the DOL.  RSA 275:53, III provides that the court "in any action brought under this subsection may, in addition to any judgment awarded to the plaintiff or plaintiffs, allow costs of the action, and reasonable attorney's fees, to be paid by the defendant."  IBM argues that this section authorizes the award of fees incurred only in the superior court appeal, not in the proceedings before the DOL.  The trial court ruled that one reasonable reading of the statute is to "apply the prepositional phrase 'of the action' to both 'costs' and 'reasonable attorney's fees.'"  Read that way, the statute authorizes the award of fees for the "action," which began at the DOL.

"We review the trial court's statutory interpretation de novo.  On questions of statutory interpretation, we are the final arbiter of the intent of the legislature as expressed in the words of a statute considered as a whole." Deere & Co. v. State of N.H., 168 N.H. 460, 471 (2015) (citation omitted).  We have stated that RSA 275:53, III in particular should be read "to effectuate the broad purpose of protecting employees."  Demers Agency, 155 N.H. at 664.  The trial court's reasonable reading of the statute furthers that purpose.  We therefore adopt that interpretation and affirm the trial court's award of attorney's fees.

Finally, because Khoury did not cross-appeal the trial court's denial of his request for liquidated damages, we express no opinion as to that ruling.

Affirmed.

CONBOY, J., sat for oral argument but did not participate in the final vote; HICKS and BASSETT, JJ., concurred; LYNN, J., dissented.

LYNN, J., dissenting.  Given that the language of the IPL specifically states it "does not constitute an express or implied contract or a promise by IBM to make any distributions under it," I think the question of whether the IPL constitutes a binding contract is a close call.  See Panto v. Moore Business Forms, Inc., 130 N.H. 730, 742 (1988) (stating that an employer who wishes to avoid liability for what might otherwise be viewed as benefit-conferring promises may do so "simply . . . by announcing in the written policy itself that

it was not an offer, or a policy enforceable as a contractual obligation"). However, despite this disclaimer, on balance I agree with the majority that the terms of the IPL sufficiently manifest an intent by IBM to be legally obligated to make incentive (commission) payments once they have been "earned." I disagree with the majority, however, that IBM breached the terms of the IPL, and I also believe that IBM did not violate the provisions of RSA 275:49 (Supp. 2016) or New Hampshire Administrative Rules, Lab 803.03 (Lab 803.03). I therefore would reverse the judgment of the trial court affirming the Department of Labor's (DOL) wage claim award and dismiss Khoury's claim.

I

IBM asserts that it did not breach the terms of the IPL or violate RSA 275:49 or Lab 803.03 because the decision to change the commission quotas was made before Khoury's commission payments were "earned." In IBM's view, Khoury's payments were not "earned" until "after the measurement of complete business results following the end of the Full-[IPL] period," a phrase which IBM interprets to grant it the right to make adjustments of commission quotas "after it assessed the impact of its complete business results." (Quotation omitted.)

Khoury counters that IBM violated the terms of the IPL because the "measurement of business results" was completed on January 15, 2015, and IBM did not provide him with written notice of the change of his quota prior to that date. In particular, he asserts that neither the "measurement of business results" provision nor the "Adjustment for Errors" provision of the IPL provides support for IBM's position because, as the trial court concluded, these provisions merely allow for the correction of ministerial mistakes, such as misplacing a decimal point, but do not allow for IBM to rethink its commission scheme after commissions have been earned. Thus, Khoury argues that IBM's retroactive adjustment of his commission quotas was a violation of the IPL terms, as well as of RSA 275:49 and Lab 803.03.

Unlike the majority, I agree with IBM's construction of the IPL. The IPL states that incentive payments are "earned" "after the measurement of complete business results following the end of the full-[IPL] period." The IPL does not define the term "measurement." Therefore, reference to the dictionary to ascertain the common and ordinary meaning of the term is appropriate. See Hudson v. Farm Family Mut. Ins. Co., 142 N.H. 144, 147 (1997); see also Holloway Automotive Grp. v. Giacalone, 169 N.H. 623, 628 (2017) ("Absent ambiguity, the parties' intent will be determined from the plain meaning of the language used in the agreement."). The word "measurement" is defined, as pertinent here, as "the act or process of measuring something"; "an area, quantity, degree; or capacity obtained by measuring." Webster's Third New International Dictionary 1400 (unabridged ed. 2002). Likewise, "to measure" means, as rele-

19

vant here, "to regulate or adjust by a rule or standard"; or "to judge or estimate the extent, strength, worth, or character of" or "to view appraisingly." Id.

The majority agrees that these definitions are accurate, but chooses instead to use an alternative definition ("measure" means "to ascertain the quantity, mass, extent, or degree of in terms of a standard unit or fixed amount," id.), which, it claims, when applied to "business results," permits IBM to engage only in "ministerial bean counting," such as correcting mathematical errors in sales figures, etc. I do not concede that the alternative definition relied upon by the majority cabins the meaning of "measure" in the way the majority asserts. But even if the majority's alternative definition could be so read, employing that definition here violates the fundamental principle of construction of written texts which holds that when two divergent meanings are possible, we must choose the one that produces reasonable results and eschew the one that produces illogical results. See Bovaird v. N.H. Dep't of Admin. Servs., 166 N.H. 755, 763 (2014) ("As between a reasonable and unreasonable meaning of the language used, the reasonable meaning is to be adopted."); Marceau v. Concord Heritage Life Ins. Co., 149 N.H. 216, 220 (2003) (declining to construe a statute so as to produce an illusory result contrary to legislative intent); Curtis v. Guaranty Trust Life Ins. Co., 132 N.H. 337, 342 (1989) (declining to interpret insurance policy language to reach an illogical result); Thiem v. Thomas, 119 N.H. 598, 602-03 (1979) ("This court must, wherever possible, adopt the interpretation of an ambiguous clause that will be in harmony with the remainder of the document, so that all provisions will have meaning and effect.").[1] As explained below, the majority's construction of the term "measurement" causes the IPL to operate in an illogical and nonsensical manner.

The majority also contends that its narrow interpretation of what it means to "measure" "business results" furthers the purpose of the wage claim statute. As I explain in section II of the dissent, however, the opposite is true. Instead of furthering the purpose of the statute, the majority's construction of the IPL is based on a view of the statute that improperly expands its purpose

---

[1] The majority's reliance on cases such as Trombly v. Blue Cross/Blue Shield, 120 N.H. 764 (1980), in which we have construed ambiguous language in insurance policies, assuming it is even applicable in a non-insurance context, but see Centronics Data Corp. v. Salzman, 129 N.H. 692, 696 (1987) ("This court has applied the rule of construction that interprets ambiguous contract language strictly against the writer only in the context of insurance contracts."), is unavailing for the same reasons discussed in the text. That is, even when construing insurance policies that arguably contain ambiguous terms, we have held that the insured is entitled to the benefit of the alleged ambiguity only if the insured's construction of the policy language is reasonable, EnergyNorth Natural Gas v. Continental Ins. Co., 146 N.H. 156, 159 (2001), and we have cautioned that we will not contort policy language to force an ambiguity merely for the purpose of resolving it in favor of the insured so as to afford coverage, id. The majority ignores that admonition here.

20

by effectively requiring IBM to pay "wages" (commissions) that it did not agree to pay.

Applying the correct dictionary definitions here, I conclude that the trial court erred by interpreting the phrase "measurement of complete business results" as narrowly as it did. Rather, I would hold that "measurement of complete business results" encompasses not only the review, validation and calculation of various mathematical figures relating to the revenues and expenses of the previous business period, but also the ability to appraise the worth of such figures in connection with controlling or regulating strategic business decision-making. The "Adjustments for Errors" provision of the IPL supports this construction. It specifically states that IBM "reserves the right to review and, in its sole discretion, adjust or require repayment of incorrect incentive payments resulting from incomplete incentives processes or other errors in the measurement of achievement or the calculation of payments, including errors in the creation or communication of sales objectives." (Emphasis added.) Read together, these provisions plainly contemplate, as IBM's Vice President of Sales Strategy and Transformation for North America, Susan Deyo, affirmed at the DOL hearing, that "measurement of complete business results" includes affording IBM the discretion to change quotas if it determines, as it did here, that they were originally established based upon an error or misjudgment as to projected deployments during the IPL term.[2]

The majority's construction of the IPL does not withstand critical scrutiny. First, although the majority ignores this fact, it is important to note that the IPL contains no time limit, following the end of the "full-[IPL] period," within which the measurement of complete business results must be accomplished. Thus, even under the majority's construction of the term "measurement" as limited to ministerial bean-counting, the mere fact — which is all the record below establishes — that complete business results were available on January 15, 2015, does not mean that IBM actually measured

_____

[2] I do not agree with the majority's contention that, unlike the "Right to Modify or Cancel" section of the IPL, the "Adjustments for Errors" section allows errors to be corrected after commissions have been "earned." Neither of the foregoing sections of the IPL define when commissions are "earned." Instead, that definition is contained in the "Full-Plan Earnings" section of the IPL, which states that "[commissions] are earned . . . only after the measurement of complete business results following the end of the IPL period." Thus, although the "Adjustments for Errors" section does allow for the recapture of payments that may have been released before an error has been discovered, the most sensible construction of these provisions, read as a whole, is that until errors have been discovered and corrected, the "measurement of complete business results" has not occurred and therefore commissions have not been "earned." (Emphasis added.) Per the "Full-Plan Earnings" section of the IPL, payments made before the time they are "earned" are considered "advance payments," which is why they can be recaptured.

21

them — or was required to have measured them — by that date.  Since the IPL is silent as to the time period within which "measurement" must be accomplished, our customary method of contract construction would read into the IPL a requirement that IBM accomplish the measurement within a reasonable time.  See Erin Food Services, Inc. v. Derry Motel, Inc., 131 N.H. 353, 360 (1988).  Although Khoury's position before the DOL was that his commissions were earned no later than January 15, 2015, when IBM was aware of the complete business results for the IPL period, he made no independent claim that, if his construction of the IPL was incorrect, IBM nonetheless delayed unreasonably before it made the decision to alter the quota.  Thus, there is no valid basis for concluding that the timeliness of IBM's measurement of complete business results violated the terms of the IPL.

The majority concedes, as it must, that at any time during or after the IPL period prior to the measurement of complete business results, IBM could have amended or cancelled the IPL in any way it chose.  This means that at any time after Khoury had performed some or all of his duties under the contract, but while IBM had less than complete information on business results for the IPL period, IBM could have made the decision to retroactively increase (or cancel) Khoury's quota based either on ministerial or mathematical errors (so-called "bean counting" mistakes) or on substantive changes in the company's strategic planning or assessment of likely business outcomes for the period.  Yet, according to the majority, the moment IBM possessed all the information (i.e., "complete business results") that would place it in a position to make the most intelligent decision-making as to whether substantive changes to the IPL should be made, it simultaneously lost the ability to do so.  How can the creation of such a Catch 22 situation possibly be regarded as a sensible construct of the IPL?[3]

Accepting the majority's view, however tenuous, that IBM actually "measured" complete business results on January 15, 2015, if one day earlier, on January 14, it had enough of a hint as to what the results would show, it could have made the exact change to Khoury's quota that it made in April, without breaching the contract.  Because the majority accepts that IBM could have made such change, it simply makes no sense to interpret the IPL to mean that IBM suddenly lost the ability to do so when it obtained the complete results the next day.  Khoury would certainly have been in no worse position because the decision to change the quota was made one day later since, even under the majority's construction of the IPL, IBM could have made the change

---

[3] Joseph Heller, the author of Catch-22 (Simon & Schuster 1961), must be smiling down from above, content in the knowledge that the paradoxical reasoning described in his novel lives on.  Mr Heller died in 1999.  See https://en.wikipedia.org/wiki/Joseph_Heller (last visited Dec. 10, 2017).

subsequent to the close of the IPL period and, thus, <u>after</u> Khoury had already performed all the work on which his quota was based. The only sensible construction of the IPL is that it gives IBM a reasonable time after the receipt of complete business results to measure those results, not just to correct them for ministerial errors, but to substantively assess them, and then to make a decision as to whether to modify the IPL's terms, including changing the quota. <u>See</u> <u>Wilson v. Int'l Bus. Machs. Corp.</u>, 610 F. App'x 886, 889 (11th Cir. 2015) (per curiam) (interpreting terms of an IPL with pertinent language identical to that at issue here as providing: "Commissions are not earned . . . until IBM <u>assesses the impact</u> of a significant transaction on an employee's sales quota." (emphasis added)).

I draw support for my view as to the proper construction of the IPL from the First Circuit Court of Appeals' recent decision in <u>Walsh v. Zurich American Insurance Company</u>, 853 F.3d 1 (1st Cir. 2017). <u>Walsh</u> was a diversity case removed to federal court, in which the plaintiff brought claims against his employer for, among other things, breach of contract and violation of New Hampshire's wage claim statute. <u>Walsh</u>, 853 F.3d at 7. The claims were based, in part, upon the plaintiff's contention that the employer wrongfully failed to pay him an incentive pursuant to a contemplated incentive plan (the Plan). <u>Id</u>. The Plan contained language providing that "INCENTIVE under the PLAN shall be solely within the discretion of the Executive Vice President of the [employer] and is subject to interpretation by him/her. The PLAN is subject to cancellation by the Executive Vice President at any time." <u>Id</u>. at 5 (quotation omitted). It also stated that "[m]anagement of the [employer] reserves the right to limit INCENTIVE in unique situations." <u>Id</u>. (quotation omitted). At trial, the district court declined to instruct the jury on the implied covenant of good faith and fair dealing because it decided that New Hampshire law barred the employer "from relying on the Plan's discretion provisions." <u>Id</u>. at 9, 10.

The First Circuit reversed, holding that the district court should have instructed the jurors that, if they found the Plan to be an enforceable agreement, "because the Plan expressly gave [the employer] discretion to limit incentive pay, they must go on to determine whether the [employer] reasonably and in good faith exercised that authority — i.e., whether the particular changes to [the plaintiff's] compensation package . . . satisfied the implied contractual covenant of good faith." <u>Id</u>. at 15. It reasoned that, unlike the commission agreements at issue in cases such as <u>Galloway v. Chicago-Soft, Ltd.</u>, 142 N.H. 752 (1998), on which the majority relies, the Plan did not give the plaintiff "a vested deferred compensation entitlement, equivalent to an ordinary commission." <u>Id</u>. at 11 (quotation omitted). After noting several factors that distinguished the Plan from an ordinary commission arrangement, the court observed:

[The plaintiff] was told in express terms that, notwithstanding the formula in the Plan, the incentive pay he will receive in the future may be limited by management in "unique situations." In other words, he was warned that his incentive pay may differ from the Plan's terms. He accepted the Plan with that warning.

Id. at 13.

Although the present case does not involve incentive payments for a unique transaction, id. at 3, I find the First Circuit's reasoning persuasive. Like the plaintiff in Walsh, Khoury was specifically informed at the time he accepted the IPL that IBM could "adjust the [IPL] terms," which included making changes to the incentive quota, at any time up until incentive payments were "earned." He also was informed at the same time that payments were not "earned" until "after the measurement of complete business results following the end of the full-[IPL] period," which would not occur until IBM had completed its review of the entire IPL period and corrected any errors that may have occurred in, among other things, the creation or setting of his quota. Khoury accepted the terms of the IPL with this knowledge.

II

This brings me to the wage claim statute.[4] In considering Khoury's statutory claim, it is important to note at the outset that, other than in circumstances having no applicability to this case (e.g., payment of the minimum wage, etc.), no provision of the wage law, RSA 275:42-:55 (2010 & Supp. 2016), can be read to impose upon an employer an obligation to pay commissions that it has not agreed to pay. Indeed, RSA 275:42, III (Supp. 2016) specifically defines "wages" as meaning "compensation, including . . . other agreement[s] adopted for the benefit of an employee and agreed to by his employer, for labor or services rendered by an employee, whether the amount is determined on a time, task, piece, commission, or other basis of calculation." (Emphasis added.) See Demers Agency v. Widney, 155 N.H. 658, 662 (2007) (noting, in upholding ruling that employee was entitled to bonus, "[o]ur holding is limited to those circumstances in which a bonus is part of an agreed-upon compensation package and the employee has performed all of the duties necessary to trigger the employer's obligation to pay the bonus" (emphasis added)). Thus, as long as the employer provides clear prior notice to the employee of the discretionary nature of his or her compensation, and the employee voluntarily agrees to such

---

[4] Although the majority finds it unnecessary to address the statutory claim, because I would reverse the trial court's decision affirming the DOL's wage claim award I must address this claim since it provides an alternative ground on which that decision arguably could be sustained.

24

an arrangement, nothing in RSA chapter 275 precludes such an employment contract.

With the foregoing in mind, I now turn to the specific statutory provisions at issue. RSA 275:49 and its implementing regulations require that employers notify their employees in writing of their rate of pay at the time of hire, and also require that employers notify their employees in writing of any change in the rate of pay before the change becomes effective. See RSA 275:49, I, II; N.H. Admin. R., Lab 803.03(a), (c). The obvious purpose of these provisions is to insure that at-will employees, such as Khoury, who enter into unilateral contracts with employers, such as IBM, by accepting the employer's promise to pay wages in consideration for the performance of services, know in advance the rate of pay at which they will be compensated. This allows an employee who is not satisfied with the offer (or the proposed change to the offer) to decline it before he or she performs any work.

Here, IBM complied with RSA 275:49, I, and Lab 803.03(a) by notifying Khoury in the IPL, which was executed at the outset of the period it covered, that his commissions were subject to changes resulting from, among other things, IBM's reassessment of the quotas needed to produce an appropriate level of incentive among its workforce. Thus, when IBM acted — in accordance with what it informed Khoury at the beginning of the contract it had the right to do — by modifying his quota, this did not constitute a "change" in the rate of pay within the meaning of RSA 275:49, II or Lab 803.03(a) and (c) for which IBM was required to provide Khoury some type of further advance notice. To read the statute or the regulation, as the DOL and the trial court did, to require such notice is to impose a meaningless redundancy that is illogical and does not accomplish the statutory purpose. See Favazza v. Braley, 160 N.H. 349, 351 (2010) (stating that in construing a statute we "examine the statute's overall objective and presume that the legislature would not pass an act that would lead to an absurd or illogical result"). Thus, even under the majority's construction of the IPL, IBM would have been entitled to change Khoury's quota retroactively after the conclusion of the IPL period up until complete business results were "measured" merely by providing him with written notice in advance that it intended to do so. But how would the receipt of such notice have served to "protect" Khoury in the manner contemplated by the statute? For example, if IBM had informed Khoury in writing on January 1 that it intended to modify his quota as of January 15, what could Khoury have done to "protect" himself? The answer is that he could have done nothing because he had already fully performed his side of the bargain by generating the deployments on which his commissions, of whatever amount, were based. For purposes of the statute, Khoury was in no worse position because he was not notified of the modification of his quota until after January 15.

The majority's implicit acknowledgment that the IPL validly gave IBM the ability to implement a change in Khoury's quota that applied retroactively to work he had already performed demonstrates the reality that RSA 275:49, II and the regulations that implement this paragraph of the statute have no applicability to this case. The attempt by the hearings officer and the trial court to apply these provisions nonetheless based on an asserted tardiness in IBM's providing post-performance notice of the measurement of business results produces a tortured construction that does not serve the protective purpose the statute is designed to achieve.

III

There is no question that the IPL, as properly construed, is a bargain heavily skewed in favor of IBM, in that it gives the company broad discretion to retroactively modify Khoury's quota. See Wilson, 610 F. App'x at 889 ("The IPL may indeed include terms that are very favorable to IBM, but those are the terms Mr. Wilson admittedly accepted."). As we have long recognized, however, a contract which seemingly gives one party unrestricted discretion to modify its terms is subject to "an implied obligation of good faith to observe reasonable limits in exercising that discretion, consistent with the parties' purpose or purposes in contracting." Centronics Corp v. Genicom Corp., 132 N.H. 133, 143 (1989). Therefore, when one party takes discretionary action that is adverse to another party, we evaluate whether that "exercise of discretion exceeded the limits of reasonableness." Id. at 144. This evaluation "depends on identifying the common purpose or purposes of the contract, against which the reasonableness of the complaining party's expectations may be measured, and in furtherance of which community standards of honesty, decency and reasonableness can be applied." Id. We also evaluate whether the damage complained of is caused by the acting party's abuse of discretion or by events that are beyond the control of either party — events against which the acting party has no obligation to protect the injured party. See id.

In this case, Khoury's position before the DOL was that IBM had no discretion to change his quota after what, in his view, was the "measurement" of complete business results that occurred on January 15, 2015. He never raised an alternative claim that, assuming the IPL authorized the retroactive increase of his quota, IBM acted unreasonably or in bad faith in doing so. Had he made this claim, I would have no hesitancy in remanding to the department to address the issue and determine if Khoury was entitled to relief on that basis. See Walsh, 853 F.3d at 15. However, since Khoury did not raise this issue, the issue is waived. I therefore would reverse the decision of the trial court and dismiss Khoury's claim for unpaid wages. I would also reverse the trial court's award of attorney's fees and statutory interest to Khoury.

26

As the above discussion demonstrates, it is hard to conclude other than that the majority has rendered a result-oriented decision, apparently driven by the view that the IPL could not possibly mean what it plainly says because that would be "unfair" to Mr. Khoury. The majority's well-meaning but paternalistic instinct to "protect" Khoury, a sales executive who, for the period in question, earned a base salary of $128,000 per year <u>before</u> any of the commissions at issue, by rewriting the contract to strike a better deal for him than he made for himself not only contravenes the proper bounds of judicial authority, <u>see</u> <u>Olbres v. Hampton Coop. Bank</u>, 142 N.H. 227, 233 (1997) ("courts cannot make better agreements than the parties themselves have entered into or rewrite contracts merely because they may operate harshly or inequitably"), but also may portend unfortunate consequences for future employees, and even perhaps more broadly for our state.[5] Now that, at least in New Hampshire, today's decision "interprets" clear contractual language in such a strained way as to make it all but impossible for IBM to utilize contracts that give it the option to adjust incentive quotas based on a retrospective analysis of results, going forward the company will likely be inclined to set quotas at sufficiently high levels to avoid the problem it experienced here. Thus, to use the example of this case, if forced to make the call in advance, next time IBM may decide that to give itself adequate "wiggle room" against an overpayment of commissions, it will set deployment quotas at, say, $1.2 million instead of $1 million. The result of such court-driven caution may thus be that sales executives like Khoury earn less in commissions than they would have prior to today's decision. Even more troubling is the prospect that, at least for national customers such as the U.S. Army (from which the deployment commissions at issue here were generated), a large company like IBM will simply decide to relocate its sales force to states which do not undermine its freedom to contract in the way New Hampshire does under today's decision. Either of these eventualities seems particularly ironic in a state whose motto is "Live Free or Die." I respectfully dissent.

---

[5] The majority professes dismay at the "tone" of the dissent. Understandably, it would prefer that I describe the folly of its position less bluntly, so that our differences might be described as a mere academic dispute over some fine point of contract law. Sometimes, however, lest legal rhetoric mask reality, it is necessary to point out that the emperor has no clothes. Unfortunately, this is one of those occasions.